267 A.2d 396.

GILBANE BUILDING COMPANY *vs.* BOARD OF TRUSTEES OF STATE COLLEGES *et al.*

JUNE 24, 1970.

PRESENT: Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J.   The plaintiff Gilbane Building Company
(Gilbane) brought this suit to nullify a contract entered
into between the State of Rhode Island and the defendant
Dimeo Construction Company (Dimeo) whereby Dimeo
was to build a junior college facility in Warwick, Rhode Is-
land, for the sum of $10,701,000.   Named as other defend-
ants are various state officials, including the Board of Trus-
tees of State Colleges, the State Purchasing Agent and the
State Director of the Department of Administration.   A
nonjury trial was held in the Superior Court.   During the
course of the trial, Gilbane amended its complaint, and,
instead of seeking to have the agreement declared void,
it sought to enjoin the expenditure of that portion of the
contract price which it considers illegal, to wit, $262,000.
An extensive hearing was held on Gilbane's complaint, and
at the conclusion of testimony the trial justice denied and
dismissed the action.   Judgment was entered for the de-
fendants and this appeal ensued.

In November 1968, the State, through its Purchasing
Agent, published an invitation for bids for the construc-
tion of a new Rhode Island Junior College to be built in
Warwick on a parcel of land called the Knight Campus.
All interested contractors and certain subcontractors were
invited to submit sealed bids.   Sub-bids were sought for
the heating,[1] plumbing, electrical work and for various
equipment usually found in a music department, a labora-
tory, or a food service center of any collegiate institution.
All bids were to be filed with the Division of Purchases,
which is located in the State House.   The sub-bids were

---

[1]The heating subcontract included such items as ventilation and air
conditioning.

to be filed by 2:30 p.m. on December 18, 1968. The general construction bids were to be received two days later by 2:30 p.m. on December 20 and opened immediately thereafter. Each general contractor had to file with its bid the names of the various subcontractors who had filed their bids and whom the contractor intended to employ. The sub-bidders were required to inform the State of the names of the general contractors who had been given a copy of their sub-bid. The bid instructions also called for the submission of different alternate bids. The alternates are various extras which the State might undertake depending on the size of the base bid accepted and the amount of money then available that could be alloted for the extras. Among the alternates for which bids were requested were such items as carpeting, folding partitions, a standby pump, and a television system. The record shows that $10,701,000 had been set aside for the entire project. This sum consisted of $4,299,234 in federal funds with the balance being money furnished by the State.

The general contractors' bids were opened shortly after the 2:30 p.m. deadline. There were but two bidders— Gilbane and Dimeo. Dimeo's base bid was $9,675,000. Gilbane's was $11,211,000. When the president of Dimeo saw the over a million-and-a-half-dollar spread between the bidders, he sensed that something was amiss. He was the man charged with the responsibility of setting his company's base bid. On the next day, Saturday, December 21, he returned to his office and checked over his work sheets. He discovered but one error. In his calculations he had used a plumbing sub-bid forwarded to Dimeo by Bookbinder Plumbing Company and a heating sub-bid filed by Lutz Engineering Company. Bookbinder's bid was in the amount of $296,541 and Lutz's bid was $1,286,768.

It is undisputed, however, that sometime on Friday, December 20, 1968, the State was informed that these two

sub-bids had been withdrawn. Accordingly, the State Purchasing Department sent telegrams to Dimeo informing it of the two withdrawals. The telegrams were not received by Dimeo until Monday, December 23. Contents of the telegrams were telephoned to Dimeo on Friday, December 20. The calls were received at Dimeo's switchboard at 1:15 p.m. While some of Dimeo's employees were aware of this development, its chief executive, for reasons that will appear later, was completely unaware that Bookbinder and Lutz had withdrawn their bids.

When the president discovered this oversight, he immediately telegraphed the State Purchasing Agent and informed him that, because of the late arrival of the information relative to the two sub-bid withdrawals, Dimeo's base bid should be amended to read $9,937,000. The difference between Dimeo's base bid as submitted and its base bid as amended is $262,000[2]—the expenditure of which Gilbane in its capacity as a taxpayer now seeks to enjoin.

Dimeo's telegram precipitated a round of conferences between representatives of defendant contractor, the state, and the federal government. The federal government's representative was James J. Sullivan, regional engineer for the Office of Health, Education and Welfare. It was Mr. Sullivan's duty to supervise the expenditure of the federal moneys which were aiding the financing of the Knight Campus project. On December 30, 1968, a meeting was held in Mr. Sullivan's Boston office. There was a review of the events of December 20 and a thorough discussion of the various facets of the problems engendered by Dimeo's indication that it would withdraw its bid if it were not amended. It was agreed by the state officials, with the

[2]The record shows that the actual difference between the two withdrawn sub-bids and the next two lowest sub-bids is $244,960. A contractor's usual margin of profit on this amount of money is $17,040. These two sums account for the $262,000 increment in Dimeo's bid.

concurrence of the federal engineer, that the Dimeo bid should be amended and that the contract could include all the alternates listed in the bid invitation. On January 6, 1969, a contract for the construction of the new junior college for the sum of $10,701,000 was executed by Dimeo and the State. On January 8, 1969, the Board of Trustees confirmed the contract, and on March 14, 1969, Gilbane commenced this suit.

Gilbane in this appeal has taken alternate positions. It argues that a public official in awarding a contract has no authority to alter the terms of a sealed bid once it has been opened or if he does possess such power, it may only be used in such cases where the mistake would warrant equitable relief by way of reformation or rescission.[3] While we think Gilbane's concern for the sanctity of the sealed bid is laudatory, we cannot accept either proposition it espouses. We do not believe that any person charged with the responsibility of safeguarding the public interest should have his discretion shackled once the bids are opened. Nor do we feel that when confronted with a problem, as presented by the record in this case, state officials must sit as a chancellor in equity before attempting to pursue a proper course of action.

There is no statutory limitation in this state on the method of awarding a contract for the construction of a public building. In the absence of any legislative requirement pertaining to competitive bidding, it is the duty of the appropriate public officials to act honestly and in good

---

[3]The overwhelming weight of authority holds that a contractor may be relieved from a *unilateral* mistake in his bid by way of rescission if (1) the mistake is of such consequence that enforcement would be unconscionable; (2) the mistake must relate to the substance of the consideration; (3) the mistake must have occurred regardless of the exercise of ordinary care; and (4) it must be possible to place the other party in status quo. See Anno. 52 A.L.R.2d 792. Generally, the remedy of reformation of a contract is available when there has been a *mutual* mistake.

faith as they determine which bidder would best serve the public interest. The judiciary will interfere with an award only when it is shown that an officer or officers charged with the duty of making a decision has acted corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion. *Slocum* v. *City*, 302 Mass. 251, 18 N.E.2d 1013; *Schulte* v. *Salt Lake City*, 79 Utah 292, 10 P.2d 625; 10 McQuillin, *Municipal Corporations* (3d ed.) §29.73(a), at 431-32. A similar rule prevails in most jurisdictions under statutes which require that contracts for public improvements be given to the "lowest responsible bidder." *State* v. *McNutt*, 152 W. Va. 186, 160 S.E.2d 170; *McNichols* v. *Denver*, 130 Colo. 202, 274 P.2d 317; McQuillin, *supra*, §29.73, at 425-26.[4] The trial justice found that Dimeo and all the public officials had at all times acted in good faith. Their conduct was marked by an absence of anything remotely suggestive of fraud, collusion or impropriety. The trial court also made a specific finding that Dimeo's president was completely unaware that there had been a change in the available sub-bidders, and as a consequence, Dimeo's final bid was based on the erroneous assumption that the sealed bids of Bookbinder and Lutz were still effective.

The circumstances which led to the mistaken calculations in the Dimeo bid cannot be seriously doubted. The bulk of subcontractors and suppliers who would work on the new school were not required to prefile their bids. Their bids were received by Dimeo on December 20, the day the bids were to be opened. It is the usual practice and custom among subcontractors to refrain from submitting their sub-bids until the day of the opening and then only within a matter of hours before the actual opening of bids. This custom stems from a fear by some subcon-

---

[4] We alluded to this principle in *Higgins* v. *Green*, 56 R. I. 330, 185 A. 686.

tractors that the amount of their bid will be "leaked" to a competitor. It also cuts down the time in which a contractor can "shop around" seeking a lower bid from some other subcontractor. Because of the pressure present on any bid day, there was a standing order at Dimeo's office that the president was not to be disturbed during the critical hours just prior to the deadline for submitting bids. The president stayed in his office working and reworking his figures in an effort to arrive at his base bid. We recognize that this official was not working under ideal conditions on December 20. The pressure present on such an occasion is quite apparent when one considers that, when the bid figure is reached, the fiscal future of the contractor may well ride on the accuracy of the bidder's calculations. During the hustle and bustle that went on as the 2:30 p.m. deadline approached, it is understandable how the State's eleventh-hour telephone message never reached Dimeo's president.

We cannot fault the actions of any of the state officers. Even with the additional $262,000, the junior college with all its extras could be built from available funds. In his testimony, the federal engineer pointed out that he and the concerned state officials were confronted with a situation where, even as amended, Dimeo's bid was still lower than Gilbane's. This witness stated that if all bids were rejected and the project was put out to bid again, there was a one per cent per month increase in the costs of construction facing the state. This federal officer also pointed out that if the contract was not signed, there was a good chance that the federal funds set aside for the junior college would be reallocated to some other project. The Superior Court was also informed of the ever-increasing number of students who are seeking admission to the junior college. Its facilities, now located in Providence, are tem-

porary. The hope was expressed that the new campus would be ready for occupancy by September 1971.

In affirming the award to Dimeo, we share Gilbane's interest that public funds be safeguarded. We do not believe, however, that those whose duty it is to contract for the construction of a public improvement should be placed in a legalistic straitjacket. We have long presumed that public officers will perform their duties properly. It is our belief that courts can and will recognize corruption, bad faith, or a manifest abuse of discretion when it appears from the evidence presented in a case. Nevertheless, when officials in charge of awarding a public work's contract have acted fairly and honestly with reasonable exercise of a sound discretion, their actions shall not be interfered with by the courts.

The plaintiff's appeal is denied and dismissed.

ROBERTS, C. J., did not participate.

*Roberts & McMahon, William F. McMahon,* for plaintiff.

Attorney for Defendants:

*Higgins, Cavanagh & Cooney, Harold E. Adams, Jr.,* for Board of Trustees of State Colleges;

*Aisenberg, Decof & Dworkin, Leonard Decof,* for Dimeo Construction Co.;

*Herbert F. DeSimone,* Attorney General, *Charles G. Edwards,* Assistant Attorney General, for State of Rhode Island.