**TRUK AWAY OF RHODE ISLAND, INC., et al.**

v.

**MACERA BROS. OF CRANSTON, INC., et al.**

No. 92–634–A.

Supreme Court of Rhode Island.

June 22, 1994.

Charles J. McGovern, Philip Noel, Robin Main, McGovern, Noel & Benik, Providence, for plaintiff.

Robert J. Sgroi, Warwick, Mark A. Pogue, Edwards & Angell, Providence, Joseph Rameaka, Gelfuso & Lachut, Cranston, for defendant.

## OPINION

WEISBERGER, Acting Chief Justice.

This case comes before us on an appeal by Macera Bros. of Cranston, Inc. (Macera), from a judgment of the Superior Court that enjoined the awarding of a contract to Macera for the removal of trash (sanitation contract) from the city of Warwick. Macera was awarded the contract by the city council as the lowest responsible bidder after consideration by various agencies of the city that presented varying recommendations to the city council. The civil action seeking injunctive relief had been brought by Truk Away of Rhode Island, Inc. (Truk Away), an unsuccessful bidder, and by David J. Wilson, one of the owners of Truk Away and a resident of the city of Warwick, who joined in the action in his capacity as a taxpayer. The trial justice granted injunctive relief but did not order the awarding of the contract to Truk Away. The judgment required that all bids be rejected and that the contract be readvertised. Following the readvertising of the contract, both Macera and Truk Away submitted bids, but Truk Away was the successful bidder. We reverse the judgment. The facts of the case insofar as pertinent to this appeal are as follows. Most of these facts are taken from the decision of the trial justice.

In March of 1992 the city of Warwick invited sanitation contractors to bid on a citywide sanitation contract. This procedure was initiated as part of an effort to privatize the removal of trash from the city. The bid opening date was set for April 17, 1992, and a mandatory prebid conference was set for April 1, 1992. After the prebid conference was held, an addendum to the specifications was issued on April 3, 1992. After the bid openings on April 17, 1992, it was found that six prospective vendors had filed bids. Only the bids of Macera and Truk Away are pertinent to this appeal. Macera submitted a primary bid and one alternate bid. Truk Away submitted a primary bid and four alternate bids. Only the alternate bids are in dispute.

The trial justice specifically found that Truk Away's first alternate bid was not the lowest responsible bid because it failed to

respond to the bid specifications in several respects. The specifications called for weekly rubbish and recycling collections, and the Truk Away bid responded in part by proposing monthly recycling collections. Furthermore the Truk Away bid contained proposals in violation of city ordinances in that its proposal for the placing of rubbish containers and the size of rubbish containers (95 gallons as opposed to 32 gallon containers) were in violation of specific ordinances (§ 8–16 and § 8–17 of the Warwick Code). Moreover, Truk Away had included a cost-of-living adjustment factor (COLA) for the second through fifth year of the contract. This inclusion made the bid figure uncertain as opposed to a fixed figure. In summary the trial justice found that Truk Away's first alternate bid was not the lowest responsible bid because it failed to respond to the bid specifications. Similarly, the trial justice found Truk Away's second alternate bid lacking in that it violated § 8–16 and § 8–17 of the Warwick Code and contained a COLA for the second through fifth years of the contract. The trial justice also found that Truk Away's two other alternate bids "clearly" did not constitute the lowest responsible bid.

In respect to the Macera alternate bid, the trial justice found "that this bid came the closest to being the lowest responsible bid." He went on to state:

"However there are several inconsistencies in this bid that has [sic] raised a serious doubt in the Court's mind whether this bid is, in fact, acceptable. First we have the technical violation of a 6 a.m. starting time when the specifications and the statute clearly say 7 a.m. as a starting time. At first blush this would appear to be an immaterial variance, especially since the City ordinances grant some authority to the Director of Public Works to permit an earlier starting time.

"Next we have the more serious problem, that is the inexplicable difference between a figure in the bid and contract form of $7,891,680 and the total program cost of $8,345,115. This Court heard no testimony from the Defendant, Macera Brothers, to explain this discrepancy in their bid, nor did it hear any explanation from the Chairman of the Finance Committee as to why it recommended the higher figure to the City Council as the lowest responsible bid. I should say parenthetically that, quite frankly, if the City Council had awarded this bid on the basis of the figure that was contained in the bid form, $7,891,680, the result of my decision would have been different. The Macera alternate bid properly made an offer to purchase the existing equipment from the City for $285,000 as distinguished from Truk Away which made no firm offer for the equipment. Among other things, that is one of the bid specifications that was very, very unclear as to what a potential bid should have been. My recollection of the language is that the specifications suggested that the successful bidder would then negotiate with the City and reach a mutually acceptable agreement. That is not the way to put out a bid that would result in a firm figure."

The trial justice makes reference to a base bid of $7,891,680. The final bid recognized in the resolution awarding the contract was $8,345,115. It should be noted that the earlier bid did not include condominium pick up. The overall figure of $8,345,115 constituted the total program cost for sanitation, recycling, and condominium services as set forth in Macera's cost proposal. It appears that when these figures were analyzed, there was a discrepancy of $9,820 between the apparent cost of services and the amount awarded to Macera by the city. In all likelihood this discrepancy would have been eliminated by a postaward agreement, just as the starting time was changed from 6 a.m. to 7 a.m.

The trial justice was also critical of the Macera bid because it contained a provision requiring that the city would help the contractor in any way possible to "alleviate the situation if it could not, for any reason, be able to operate because of a strike." The testimony presented to the court suggested that the city did not intend to honor this provision in any event because it was selling its sanitation trucks to the successful bidder and, therefore, would be unable to be of assistance in the event of a strike. It should, however, be noted that the original contract had provided that an interruption of service

because of a strike would not constitute a breach of the contract. A later addendum eliminated this provision.

It was for these reasons that the trial justice concluded that the Macera bid did not conform to the specifications and addenda issued by the city and, therefore, should not have been declared the lowest responsible bid.

The trial justice rejected allegations by Truk Away that it was improper for Councilman C. Kenneth Wild, Jr., to attempt to negotiate in his capacity as chairman of the Finance Committee in order to clarify certain portions of the bid, such as the 6 a.m. starting time, and held as a matter of law that there was no merit to such allegations.

The trial justice also seemed to be critical of a report made by the department of public works that favored Truk Away without indicating the failure of Truk Away to respond to the requirements of the specifications. He also stated that he could not understand (1) why the "strongly-worded" language of the city solicitor contained in his memorandum to finance director Christine N. Tague on June 26, 1992, recommending that all bids be rejected and rebid because of complicated formulas in determining comparable services and (2) why the request of the finance director to reject all bids for the same reason were totally ignored. The city solicitor's memorandum was introduced as plaintiffs' exhibit No. 24 and reads as follows:

> "In response to your inquiry as to the potential litigation exposure pertaining to the privatization of sanitation services, it is my opinion that the City has real potential financial exposure surrounding these bids due to the complicated formulas in determining comparable service versus cost. Based upon the potential exposure, I would recommend that all bids be rejected and rebid. However, in the rebidding process, specifications should be more defined as to comparable service and associated cost."

The foregoing statement indicates the sensitivity of the city solicitor to the possibility of litigation arising out of possible misunderstanding of the specifications and the responses thereto by the two principal competitors. It is naturally appropriate for a city solicitor to seek to avoid litigation. It is not the obligation of the city council in the performance of its functions to accept the advice of the city solicitor without question or modification. We might suggest that the rejection of bids (as occurred in this case) would not necessarily have avoided litigation even at the point when the city solicitor's letter was written. The most effective time for the city solicitor to have raised questions about the specifications was prior to the time that the contract and specifications were issued to potential bidders.

## INJUNCTIVE RELIEF

■ The trial justice recognized that standards to be followed by the judiciary were contained in *Paul Goldman, Inc. v. Burns,* 109 R.I. 236, 283 A.2d 673 (1971), and in the seminal case of *Gilbane Building Co. v. Board of Trustees of State Colleges,* 107 R.I. 295, 267 A.2d 396 (1970). Guided by these cases, the trial justice held that the Judiciary will normally interfere with the awarding of a contract by a state or a municipal agency only when it is shown that the officers charged with the duty of making a decision have acted corruptly or in bad faith or so unreasonably or so arbitrarily as to be guilty of palpable abuse of discretion.

He went on to state that he did not find any acts of corruption or even of bad faith on anyone's part, but he found that the Warwick City Council on July 13, 1992,

> "acting on recommendations of its Finance Committee, did act unreasonably and arbitrarily and are guilty of a palpable abuse of discretion in awarding this contract to Macera Brothers of Cranston, Inc. By this finding do I by no means intend to suggest that they should have awarded the contract to Truk Away of Rhode Island. Because if they had done that, there would have been even a more serious abuse of discretion in the Court's view.
>
> "I find that the bid specifications and addendums [*sic*], coupled with all of the extracurricular activities of the Finance Committee, the Department of Public Works and various other City officials and City agencies created so much confusion

that an accurate and precise fixed bid could not be awarded. I, therefore, grant the Plaintiff's prayers in part by permanently enjoining the City of Warwick and its responsible officials from awarding this contract to Macera Brothers of Cranston, Inc. or to Truk Away of Rhode Island, Inc. I further order that all bids received by the City of Warwick be rejected and that the City readvertise the bids, if it is still interested in privatizing the sanitation systems of the City."

Essentially the trial justice found the specifications and addenda so confusing as to render the awarding of a bid pursuant thereto to constitute a "palpable abuse of discretion." The trial justice certainly recognized the principles set forth in our two controlling cases.

In *Gilbane Building Co., supra,* a very complex bidding arrangement had been set forth by the State of Rhode Island through its purchasing agent for the construction of a new Rhode Island Junior College. All general contractors and certain subcontractors were invited to submit sealed bids. Subbids were sought for the heating, plumbing, electric work and for various equipment usually found in the various subdivisions of a collegiate institution. Dimeo Construction Co. (Dimeo) submitted a bid in reliance upon a subbid for plumbing and a subbid for heating. Unknown to Dimeo was the fact that these subbids had been withdrawn prior to the opening of Dimeo's principal bid. This withdrawal resulted in subsequent negotiations between Dimeo and both state and federal officials (because the latter were participating in the financing of the project). As a result of these discussions the bid was modified and the board of trustees of the state colleges approved the contract. Gilbane sued, both as a competing bidder and as a taxpayer, seeking to nullify the contract. The trial justice rejected these contentions. In affirming the Superior Court judgment, this court enunciated the principle that the Judiciary will interfere "only when it is shown that [the] officer or officers charged with the duty of making a decision [have] acted corruptly or in bad faith, or so unreasonably or arbitrarily as to be guilty of palpable abuse of discretion." 107 R.I. at 300, 267 A.2d at 399.

The court went on to say that a similar rule prevails in most jurisdictions under statutes that require that a contract for public improvements be given to the "'lowest responsible bidder.'" *Id.* This court went on to formalize the doctrine in the following language:

"In affirming the award to Dimeo, we share Gilbane's interest that public funds be safeguarded. We do not believe, however, that those whose duty it is to contract for the construction of a public improvement should be placed in a legalistic straitjacket. We have long presumed that public officers will perform their duties properly. It is our belief that courts can and will recognize corruption, bad faith, or a manifest abuse of discretion when it appears from the evidence presented in a case. Nevertheless, when officials in charge of awarding a public work's contract have acted fairly and honestly with reasonable exercise of a sound discretion, their actions shall not be interfered with by the courts." *Gilbane,* 107 R.I. at 302, 267 A.2d at 400.

Similar principles were recognized in *Paul Goldman, Inc. v. Burns, supra,* in which officials of the city of Pawtucket awarded a contract for the purchase of thirteen motor vehicles for use of the police department, even though the successful bidder was slightly higher than the plaintiff. The contract was awarded to Pierce Chevrolet, Inc., on the recommendation of the chief of police that it would be more advantageous to purchase Chevrolet automobiles since the department already had a fleet of thirty-three vehicles, all of which were then Chevrolets. The Goldman bid was to provide thirteen Dodge automobiles. Goldman urged the court to vacate the award on the ground that the city charter of Pawtucket, § 4–1004, established a policy "'to award all contracts to the lowest responsible bidder, except where previous dealings with the lowest bidder shall warrant the rejection of his bid.'" *Goldman,* 109 R.I. at 239, 283 A.2d at 675. This court upheld the dismissal of Goldman's action, on the ground that the purchasing board honestly

and in good faith accepted the police chief's recommendation even though the price submitted was slightly higher. Citing *Gilbane*, this court said "we will not interfere with the award absent a showing that the board acted corruptly or in bad faith, or so unreasonably or arbitrarily as to be guilty of a palpable abuse of discretion." 109 R.I. at 240, 283 A.2d at 676.

In the case at bar we accept the factual findings of the trial justice. Specifically we accept his finding that there is no evidence of any bad faith or corruption on the part of the officials of the city of Warwick. However, we do not accept the trial justice's conclusion that the Warwick City Council committed a palpable abuse of discretion in awarding the contract to Macera.

Modern state and municipal contracts are often complicated. Certainly in *Gilbane* the bidding procedure was complex and difficult and many alternative specifications were listed in the bid invitation. Our review of the record indicates that the specifications of the Warwick sanitation contract were extensive and contained numerous provisions and alternatives as well as clarifying addenda. However, to hold that they were arbitrary or capricious in light of the standards of judicial review was unjustified. In effect, we are of the opinion that the trial justice substituted his judgment for that of the council. He found the bidding procedures confusing. This does not mean that those procedures were arbitrary or capricious. We must recognize that the trial justice was introduced to this controversy by an unsuccessful bidder whose counsel proceeded to cross-examine members of the city council and other officials of the city. The inherent nature of cross-examination is such that it is designed to bring out inconsistencies and to emphasize ambiguities. In this situation counsel for the unsuccessful bidder, whose own bid did not qualify under any standards, was successful in creating a sufficient aura of confusion as to cause the trial justice to vacate the award. We hold that in so doing, the trial justice committed an error of law.

■ We reaffirm the principles set forth in *Goldman* and *Gilbane*, both *supra*, and express our firm belief that government by injunction save in the most compelling and unusual circumstances is to be strictly avoided. In the absence of bad faith or corruption, a finding of palpable abuse of discretion should be approached with grave caution and be based upon much more compelling evidence of arbitrariness or capriciousness than may be found in mere complexity. We admonish all justices of the Superior Court to exercise great care before issuing an injunction vacating an award of either a state or a municipal contract. In the event that such an injunction should be issued pursuant to Rule 65 of the Superior Court Rules of Civil Procedure, we hereby require for the future that Rule 65(c) should be followed in that the party seeking the injunctive relief shall give security for the payment of such costs and damages as may be incurred or suffered by any party that is found to have been wrongfully enjoined or restrained.

## DAMAGES FOR WRONGFUL INJUNCTION

■ In respect to the remedy sought by Macera, we are constrained to point out that no security was ordered in this case. This is not unusual, since the rule makes the ordering of such security prior to the issuance of this opinion not mandatory but subject to the exercise of choice or discretion by the Superior Court. In this type of action involving the enjoining of the award of a public contract, security shall be henceforth required in the absence of a finding of corruption or bad faith.

Since no security was filed in this case, we are bound by our prior decisions in *Johnson Wholesale Perfume Co. v. Blumen*, 63 R.I. 485, 9 A.2d 857 (1939), and *Little v. Barnett Carter & Co.*, 119 R.I. 686, 382 A.2d 815 (1978).

In *Blumen* this court declared that there was no liability at common law for damages suffered by reason of an injunction erroneously granted, unless suit was maliciously brought. The court expressed this proposition in the following language:

"There is no liability at common law for damages suffered by reason of an injunction erroneously granted, unless suit was

maliciously brought. *Yonkers v. Federal Sugar Refining Co.*, 221 N.Y. 206, 116 N.E. 998. In that case *Cardozo, J.*, as a reason for this rule stated that: 'Public policy was thought to demand that the free pursuit of remedies in the courts should not be obstructed by the menace of liability for innocent mistake.' The supreme court of the United States has said that 'damage arising from the act of the court itself is *damnum absque injuria*, for which there is no redress except a decree for the costs of the suit, or, in a proper case, an action for malicious prosecution.' *Russell v. Farley*, 105 U.S. 433, [15 Otto] 438 [26 L.Ed. 1060]. These are typical of practically all the cases which hold that, in the absence of a bond or undertaking for damages or a judgment for costs, there is no liability when an injunction has been improvidently issued. 32 C.J. 434, § 744." *Blumen*, 63 R.I. at 490, 9 A.2d at 859.

We see no indication in the case at bar that the action was maliciously brought. We do believe that Truk Away as an unsuccessful bidder whose bid did not meet the specifications in several significant respects had very questionable standing to seek to vacate the award of this contract. It has nevertheless succeeded in obtaining issuance of the injunction by the Superior Court. Under our case law we are unable to require Truk Away to make Macera whole. Certainly there is no basis upon which we should or could require the city of Warwick, which simply obeyed the injunction, to respond in damages to Macera.

Consequently, the only remedy we may grant at this time by virtue of our inherent power is to require that Truk Away not only pay the usual costs of this action but also pay to Macera its reasonable attorneys' fees for defending against the injunction and for prosecuting this appeal. We also must declare that the contract awarded to Truk Away pursuant to advertisements issued by the city of Warwick in good faith based upon the injunction issued by the Superior Court is valid and cannot now be challenged in this or any other subsequent litigation. It should be noted that although the city of Warwick resisted the granting of injunctive relief in the Superior Court, it has not joined Macera in its appeal to this court.

For the reasons stated, the appeal of Macera is sustained. The judgment of the Superior Court granting the injunction is reversed. The papers in the case are remanded to the Superior Court for further proceedings to ascertain Macera's costs of this action including reasonable attorneys' fees as set forth above.