**ASSOCIATED BUILDERS & CONTRACTORS OF RHODE ISLAND, INC., et al.**

v.

**DEPARTMENT OF ADMINISTRATION, State of Rhode Island.**

Nos. 2001–40–Appeal, 2000–514–M.P.

Supreme Court of Rhode Island.

Jan. 4, 2002.

Christopher C. Whitney, Providence, for plaintiff.

John Breguet/Thomas Palombo, Richard B. Woolley, Providence, for defendant.

BEFORE: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, J.

The contest over whether Rhode Island's competitive bidding statute barred project labor agreements (PLAs) in public construction contracts was engaged well before the convocation center and ice facility opened to official events at the University of Rhode Island. Generally speaking, a PLA is a prehire collective bargaining agreement between an owner and labor unions involving a specific construction project. As a condition for accepting work on the project, contractors are required to execute the agreement and abide by its terms.

In our opinion, the State Purchases Chapter, G.L.1956 chapter 2 of title 37 (state purchases act or statute) does not specifically permit, nor does it prohibit PLAs. Under the state purchases act, decisions made by the awarding authority are entitled to a presumption of correctness and, accordingly, are given great deference by this Court. But given the presumptively anticompetitive nature of such agreements, the state, before adopting a PLA in a contract, must demonstrate that (1) the size and complexity of the project are such that a PLA supports the objectives of the state purchases act, and (2) the chief purchasing officer or purchasing agency has performed an objective, reasoned evaluation demonstrating that the adoption of a PLA furthers statutory goals. This requirement, however, does not affect the existing authority of the purchasing officer to make bidding process decisions otherwise held and authorized pursuant to the state purchases act. The case reached this Court following the consolidation of the state's petition for certiorari and its appeal of a Superior Court judgment granting declaratory and injunctive relief, thereby halting the state's use of a PLA.

### Facts and Procedural History

This litigation arose in the course of construction of a 200,000–square–foot convocation center and a 65,877–square–foot ice facility (collectively, the project) on the Kingston campus of the University of Rhode Island (URI). The total cost of the project was estimated at $73,000,000, including $53,000,000 in construction costs, to be funded from revenue bonds, state appropriations, fundraising, and donations. The project is one of several currently underway or in the planning stages at URI, totaling approximately $80,000,000. Because the new facilities will become part of the URI campus, title to the project is held by the State of Rhode Island Board of Governors for Higher Education, thereby bringing the project under the purview of the state purchases act.

The state engaged a private company, Gilbane Building Company (Gilbane), to act as program manager for the project. Following Gilbane's recommendation, the state adopted a multiple bid package approach for the project, instead of using one or two general contracting packages. Although Gilbane conducted a study, entitled "The Benefits of a Multiple Bid Package Approach for the University of Rhode Island Convocation Center and Ice Arena," the study made no mention of PLAs. The trial justice found that the state's purposes in adopting multiple bid packages were:

"1) Saving the State a significant amount of money.

"2) Expediting the schedule completion date.

"3) Maximizing the State's opportunity to control costs.

"4) Maximizing the opportunity for local participation.

"And, finally:

"5) Providing the State better control over the selections of the most qualified subcontractors."

The project was divided into thirty-four bid packages, six of which were awarded before the round of bid solicitations at issue here.[1] These first six bid packages contained no PLA requirement.

In the spring of 1999, Lawrence Bacher, project manager for Gilbane, first suggested to Paul DePace, the associate director of capital projects at URI, that a PLA might be appropriate for the project. At that time, DePace did not pursue the idea further, in part because there were no state purchasing regulations on the subject. Robert Carl, Ph.D., Director of the Rhode Island Department of Administration (state or defendant), who serves as chief purchasing officer for the State of Rhode Island, testified that he presumed from his first knowledge of the project that it "would be appropriate for a PLA." By the fall of 1999, the state was considering amending the state purchasing regulations to include provisions for the use of PLAs in public contracts, an amendment that apparently was not made.

In his decision, the trial justice found that the initiative to use a PLA on the convocation center project was "on-again and off-again" until, "following a flurry of meetings" in the fall of 2000, a PLA for the project (URI PLA) was negotiated and signed. The trial justice further found that from the summer of 2000 onward, the Department of Administration, URI, and Gilbane all endorsed the concept of a PLA, their only hesitation stemming from a fear of legal challenges and possible consequent delays and from the fact that work was already underway without a PLA in place. The trial justice noted that "a number of the collective bargaining agreements involved in connection with various crafts that will be working on this project by their terms expire during the anticipated construction schedule for the Project."

The dispute underlying the instant litigation arose in connection with a round of bid solicitations issued in November 2000, involving fourteen individual bid packages, each issued with the URI PLA attached.[2] Each bid solicitation stated:

"Bidders are advised that execution of this Project Labor Agreement, that is completion and signature by an authorized agent of the successful bidder, shall be a pre-requisite to contract award. **Note carefully that the attached [PLA] is an integral part of the bid specifications and that the fully executed [PLA] should be included in the bid submission.**" (Bold in original.)

The solicitations also required that bidders submit "Bid security in the form of a Bid

---

1. Of those six packages, five were awarded to union contractors, and one was awarded to a nonunion or "open shop" contractor. By the time of the preliminary injunction hearings, work on three of the packages had been completed, and three were underway.

2. Some of the bids at issue were initially issued without a PLA requirement. These were recalled a day later and reissued with the URI PLA attached.

Bond * * * in the amount of a sum no less than 5 percent of the Bid Price" and required that sealed bids be submitted by December 12, 2000, the opening date. The solicitations warned that a successful bidder that failed to commence work or provide the required bonds would forfeit the security up to the amount of the difference between its bid and the bid upon which a contract was eventually signed.

The URI PLA itself was a product of negotiations among the state, Gilbane, and the Rhode Island Building and Construction Trades Council (building trades) "on behalf of its affiliated Local unions" (unions).[3] Article I, section 2, of the URI PLA, setting forth the purpose of the agreement, provided in part:

> "The timely and successful completion of the Project is of vital importance to the State. Therefore, it is essential that the construction work be done in an efficient and economical manner in order to secure optimum productivity and eliminate any delays in the work."

Accordingly, the URI PLA required that any successful bidders hire employees through union hiring halls and contribute to union benefit funds and industry funds. The mandatory contributions were estimated to increase the cost of labor for nonunion contractors by 37 percent. In exchange, the unions promised not to engage in any strikes or work stoppages during the life of the project, and contractors promised not to engage in any lockouts. In addition, the URI PLA established mandatory dispute resolution mechanisms, uniform hours for employees, and "base hourly wage rates for those classifications as specified in the Local Collective Bargaining Agreements." It was disclosed at oral argument that the bid packages apparently omitted any information on the wages that would be required to be paid under the PLA. The URI PLA prohibited any discrimination against nonunion employees by union hiring halls.

On November 29, 2000, Associated Builders & Contractors of Rhode Island, Inc., together with certain nonunion contractors and two supervisors, James Rezendes and Kenneth Stafford (collectively, contractors), filed a complaint for declaratory and injunctive relief, claiming that the state's imposition of the URI PLA violated the state purchases act, the Rhode Island Civil Rights Act of 1990, G.L.1956 chapter 112 of title 42, and the Constitution of the State of Rhode Island. The contractors alleged, *inter alia*, that "[u]se of a PLA * * * will effectively exclude the [contractors] from the Project" and will "result in greatly inflated costs for the taxpayers of the State of Rhode Island by significantly reducing competition for work on the Project."

One such contractor, Robert F. Audet, Inc. (Audet), operates a nonunion or "open shop" that performs both public and private work. The vice president of Audet, Kenneth Freeborn (Freeborn), testified that Audet had performed electrical work for URI in the past and possessed the experience and capacity to perform the type and magnitude of work required for the project. Freeborn also testified that Audet had intended to bid on Bid Package 14, a bid solicitation for the project that was originally issued in October 2000 without a PLA requirement. Freeborn

---

**3.** There is no evidence that the unions signed the PLA, although the building trades representative signed on their behalf.

claimed that when he learned that the solicitation had been withdrawn and reissued with a PLA requirement, he decided not to bid on it because the PLA was "restrictive" and placed Audet on a "noncompetitive basis" with other (union) bidders.

The contractors moved for a preliminary injunction, and a hearing was commenced. On December 15, 2000, the Superior Court issued an interim order, directing the state to refrain from opening bids on the project until December 26, 2000. The state moved to stay the order, and the trial justice denied the stay. That same day, the state petitioned this Court for a writ of certiorari to stay the order or, alternatively, to require contractors to post a bond.

On December 21, 2000, after review, this Court issued an order granting the writ, but deferred proceedings until the hearing was concluded on the preliminary injunction. We directed the Superior Court to order contractors to post a bond in the amount of $284,000, which contractors posted. The trial justice later ordered an additional bond of $67,500.

Near the close of the hearing on the preliminary injunction, contractors moved to consolidate that proceeding with a hearing on the merits. After receiving clarification from this Court that our grant of the writ did not impede a consolidation of the hearing on the preliminary injunction with a hearing on the merits, the trial justice granted plaintiffs' motion to consolidate. Subsequently, by consent order, the parties stipulated that the preliminary injunction hearing already held would constitute a trial on the merits. On January 16, 2001, the trial justice rendered a bench decision, granting the requested injunctive relief, and final judgment was entered in favor of contractors on January 22, 2001.

After granting an expedited appeal by the state, this Court stayed the judgment of the Superior Court on February 15, 2001, thereby allowing the state to proceed with the awarding of contracts. In so doing, we stated that "[t]his appeal will not be deemed mooted by the stay of the judgment, since the issues raised by the appeal are capable of repetition and yet may evade review." The contractors moved to stay our order of February 15. We denied the motion and subsequently consolidated the state's appeal with its petition for certiorari.

### Standard of Review

■ ■ This Court has consistently held that "the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Technology Investors v. Town of Westerly*, 689 A.2d 1060, 1062 (R.I.1997); *see also Foley v. Osborne Court Condominium*, 724 A.2d 436, 439 (R.I.1999). The same deference is afforded to mixed questions of law and fact, " 'as well as [to] the inferences and conclusions drawn from the testimony and evidence.' " *DEPCO v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001) (quoting *Hawkins v. Town of Foster*, 708 A.2d 178, 182 (R.I.1998)). But pure questions of law and statutory interpretation, such as whether the state purchases act prohibits the use of PLAs in connection with public contracts, are reviewed *de novo* by this Court. *Id.*

### Standing and Mootness

■ ■ We first address the state's contention that contractors lack standing to

challenge the imposition of the URI PLA.[4] "Standing is an access barrier that calls for the assessment of one's credentials to bring suit." *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, 452 A.2d 931, 932 (R.I.1982). This Court has held that the standing requirement is satisfied when " 'the plaintiff alleges that the challenged action has caused him [or her] injury in fact, economic or otherwise.' " *Cummings v. Shorey*, 761 A.2d 680, 684 (R.I.2000) (quoting *Rhode Island Ophthalmological Society v. Cannon*, 113 R.I. 16, 22, 317 A.2d 124, 128 (1974)). When deciding a standing issue, "[t]he line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury." *Matunuck Beach Hotel, Inc. v. Sheldon*, 121 R.I. 386, 396, 399 A.2d 489, 494 (1979) (quoting Davis, *Administrative Law of the Seventies*, § 22.02–10 at 507 (1976)).

Once the requirement of injury in fact has been satisfied, we have permitted plaintiffs to "assert the broader claims of the public at large," in order to vindicate the public interest. *Blackstone Valley*, 452 A.2d at 933. Nevertheless, the touchstone of our standing requirement remains "whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to ensure concrete adverseness that sharpens the presentation of the issues upon which the court depends for an illumination of the questions presented." *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962)).

In this case, the essence of contractors' argument was that the imposition of the URI PLA effectively excluded them from the bidding process, thereby depriving them of potential income from the project. Indeed, the imposition of the PLA requirement presented Audet and the other contractors with a "direct and immediate dilemma." *Rhode Island Association of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir.1999). Essentially, three options remained open to contractors. First, they could have submitted a bid adhering to the allegedly illegal PLA requirement, something contractors argued they could not do competitively because of the increased costs that the PLA imposed on open shop contractors, compared to union bidders, and because of the inability of open shop contractors to use their own workforce under the PLA. Second, contractors could have submitted a bid disregarding the PLA requirement, which would have resulted in a rejection of the bid and possible forfeiture of the bid security. Third, contractors could have declined to submit a bid and thereby forgone any possibility of income from the project. By presenting contractors with the Hobson's choice of submitting a futile bid or not bidding at all, the state caused an injury in fact sufficient to satisfy contractors' standing requirements.

The state argued on appeal that because none of the contractors had bid on the project, any claim of injury is hypothetical and fails to satisfy standing requirements. We reject this argument. It is true that this Court has described an "injury in fact" as one requiring "an invasion of a legally protected interest which is (a) concrete and particularized * * * and (b) actual or imminent, not 'conjectural' or 'hypothetical.' " *Pontbriand v. Sundlun*, 699 A.2d 856, 862 (R.I.1997) (quoting *Lujan v. De-*

---

**4.** At trial, the state also contended that contractors failed to exhaust their administrative remedies. Because this issue was not raised on appeal, we do not address it here.

*fenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992)). But, to limit standing to actual bidders would exact too high a price on potential plaintiffs and undermine the enforcement of the competitive bidding statutes. The Legislature has recognized the important role of prospective bidders in the enforcement of the competitive bidding statutes by providing that "[a]ny actual *or prospective bidder,* offeror, or contractor who is aggrieved in connection with the solicitation or selection for award of a contract may file a protest with the chief purchasing officer." Section 37–2–52(b). (Emphasis added.)

In the case at bar, pursuant to § 37–2–40(b), the solicitation required all bidders to submit 5 percent of the bid price as bid security. If a contractor had submitted a bid and had been selected for contract award, its refusal to execute the URI PLA would have resulted in forfeiture of its bid security in the amount of the difference between its bid and the bid eventually selected, up to the full amount of the security.

Here, the trial justice found that "at least one, and probably more, of the plaintiffs, including * * * Robert Audet, Inc., has demonstrated to the Court that the facts alleged cause injury to it which is sufficiently real and immediate so as to give it standing to bring this proceeding." [5] We concur with this finding, and therefore we need not, as we have done on rare occasions, relax our standing requirements "because of substantial public interest in having a matter resolved." *Blackstone Valley,* 452 A.2d at 933 (citing *Sennott v.*

*Hawksley,* 103 R.I. 730, 732, 241 A.2d 286, 287 (1968)). Moreover, whether the state's use of PLAs violates the state purchases act is a question of law that is capable of repetition, yet may evade review. Therefore, as we indicated in our stay of the Superior Court's judgment, this case will not be deemed mooted.

Finally, any dispute with respect to the bonds posted by contractors during the course of litigation was rendered moot by the final judgment entered in Superior Court on January 22, 2001, "dismissing and discharging" the bonds. Additionally, any request by contractors for injunctive relief on appeal has been mooted by the award of all contracts at issue. As was the case in *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence,* 754 A.2d 89, 91 (R.I.2000) (per curiam), contractors here "are not seeking to undo what has been done, that is, nullify the bids," but, rather, are seeking to resolve a question of law.

### State Purchases Act

We now address the question of law that may affect numerous large-scale state construction projects, namely, whether the state purchases act permits or prohibits the use of PLAs in conjunction with the award of public contracts.

In 1989, the state legislature enacted sweeping legislation that updated the law governing state procurement by repealing chapter 2 of title 37 of the General Laws in its entirety and replacing it with a new set of provisions based on the American Bar Association's Model Procurement Act. P.L. 1989, ch. 526, §§ 1 and 2. The new legisla-

---

**5.** The trial justice did not rule on the standing of the two plaintiff supervisors, and therefore, we decline to address their standing. We note that the state contested their standing before this Court, pointing out that supervisors were "specifically excluded from the scope of the [PLA]."

tion, entitled "State Purchases," directed: "This chapter shall be liberally construed and applied to promote its underlying purposes and policies," § 37–2–2(a), namely, to:

"(4) Provide for increased public confidence in the procedures followed in public procurement;

"(5) Insure the fair and equitable treatment of all persons who deal with the procurement system of the state;

"(6) Provide increased economy in state and public agency procurement activities by fostering effective competition;

"(7) Provide safeguards for the maintenance of a procurement system of quality, integrity and highest ethical standards; and

"(8) Ensure that a public agency, acting through its existing internal purchasing function, adheres to the general principles, policies and practices enumerated herein." Section 37–2–2(b).

▆ The primary goals of the statute are similar to those of the competitive bidding statutes in New York and Massachusetts, namely, "(1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts." *New York State Chapter, Inc. v. New York State Thruway Authority,* 88 N.Y.2d 56, 643 N.Y.S.2d 480, 666 N.E.2d 185, 190 (1996) (hereinafter, *New York Thruway* ); *see John T. Callahan & Sons, Inc. v. City of Malden,* 430 Mass. 124, 713 N.E.2d 955, 961 (1999) (quoting same).

Section 37–2–18 of the statute, which sets forth the guidelines for competitive sealed bidding, provides in part:

"(a) Contracts exceeding the amount provided by § 37–2–22 [$10,000 for construction] shall be awarded by competitive sealed bidding unless it is determined in writing that this method is not practicable.

"* * *

"(b) The invitation for bids shall state whether the award shall be made on the basis of the lowest bid price or the lowest evaluated or responsive bid price. If the latter basis is used, the objective measurable criteria to be utilized shall be set forth in the invitation for bids, if available.

"* * *

"(e) The contract shall be awarded with reasonable promptness by written notice to the responsive and responsible bidder whose bid is either the lowest bid price, lowest evaluated, or responsive bid price."

Interpreting nearly identical provisions in the municipal competitive bidding statute, we held that such language "does not preclude an awarding authority from taking into account factors beyond price when selecting the 'best' or 'superior' bidder." *H.V. Collins Co. v. Tarro,* 696 A.2d 298, 303 (R.I.1997). In addition, § 37–2–31 provides that "[s]ubject to the limitations of §§ 37–2–29 and 37–2–30, any type of contract which will promote the best interests of the state may be used." At present, neither the state purchases act nor the regulations promulgated pursuant to the statute refers to PLAs. In consideration of these factors, we are of the opinion that PLAs, such as the URI PLA, do not *per se* violate the state purchases act, nor are PLAs *per se* permissible under the statute and indeed, contractors conceded that they "never claimed that project labor agreements are *per se* illegal."

Section 37–2–51 establishes a "presumption of correctness" for state procurement decisions:

"The decision of any official, board, agent, or other person appointed by the state concerning any controversy arising under or in connection with the solicitation or award of a contract shall be entitled to a presumption of correctness. The decision shall not be disturbed unless it was: procured by fraud; in violation of constitutional or statutory provisions; in excess of the statutory authority of the agency; made upon unlawful procedure; affected by other error or law; clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; arbitrary; capricious; characterized by an abuse of discretion; or clearly unwarranted exercise of discretion."

This presumption comports with the standard enunciated by this Court in the seminal case of *Gilbane Building Co. v. Board of Trustees of State Colleges*, 107 R.I. 295, 300, 267 A.2d 396, 399 (1970), in describing judicial review of state contract awards: "The judiciary will interfere with an award only when it is shown that an officer or officers charged with the duty of making a decision has acted corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion." We noted that "[a] similar rule prevails in most jurisdictions under statutes requiring that contracts for public improvements be given to the 'lowest responsible bidder.'" *Id.* We have also applied this standard to the award of municipal contracts under municipal competitive bidding statutes. *See H.V. Collins Co.*, 696 A.2d at 302; *Truk Away of Rhode Island, Inc. v. Macera Bros. of Cranston, Inc.*, 643 A.2d 811, 816 (R.I.1994); *Paul*

*Goldman, Inc. v. Burns*, 109 R.I. 236, 240, 283 A.2d 673, 676 (1971).

We are of the opinion that the requirements of the *Gilbane* rule have been incorporated, expanded, and made applicable to procurement decisions under the state purchases act, thereby reaffirming the principle that "government by injunction save in the most compelling and unusual circumstances is to be strictly avoided." *Truk Away*, 643 A.2d at 816. In general, "[w]e do not believe * * * that those whose duty it is to contract for the construction of a public improvement should be placed in a legalistic straitjacket." *Gilbane*, 107 R.I. at 302, 267 A.2d at 400.

■ Nevertheless, when, as here, a PLA requirement is at issue, we believe that the state bears a different burden than when other types of specifications are at issue. Under the *Gilbane* standard, the party challenging a state procurement decision or bid specification generally bears the burden of proof. *Id.* at 300, 267 A.2d at 399. But here, as was pointed out by the New York Court of Appeals:

"By comprehensively requiring all bidders to conform to a variety of union practices and limiting their autonomy to negotiate employment terms with a labor pool that includes nonunion workers—attributes that, by their scope, set these agreements apart from more common specifications, like construction materials or design criteria—PLAs have an anticompetitive impact on the bidding process." *New York Thruway*, 643 N.Y.S.2d 480, 666 N.E.2d at 188.

Thus, although any bid specification may narrow the universe of potential bidders on a project by requiring specialized skills, materials, or conditions, PLAs deter a particular class of bidders, namely, nonunion

bidders, from participating in the bid process for reasons essentially unrelated to their ability to competently complete the substantive work of the project. On the other hand, as the size and complexity of a project increases, so too does the premium on timely completion, and for certain projects, the potential benefits of a PLA, such as the ban on work stoppages, may come to outweigh the anticompetitive impact of such agreements. Moreover, the assurance of predictable costs and the procurement of a steady supply of labor should not depend on whether the owner of the project is a public or private entity. "To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same." *Building & Construction Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 231, 113 S.Ct. 1190, 1198, 122 L.Ed.2d 565, 579 (1993). (Emphasis in original.)

In circumstances similar to those that existed in the case before us, the New York Court of Appeals reasoned that when a PLA appears as a specification in a public contract, "more than a rational basis must be shown" for its inclusion. *New York Thruway,* 643 N.Y.S.2d 480, 666 N.E.2d at 190.

"The public authority's decision to adopt such an agreement for a specific project must be supported by the record; the authority bears the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statutes." *Id.*

After citing *New York Thruway* with approval in *Callahan,* the Massachusetts Supreme Judicial Court set a similar standard for the adoption of PLAs under that state's competitive bidding statutes:

"We agree with [the New York court's] formulation. When an awarding authority's use of a PLA is challenged, the authority bears the burden of demonstrating that it adopted a PLA to further the purposes of the competitive bidding statute * * *. * * * In other words, a PLA will not be upheld unless (1) a project is of such size, duration, timing, and complexity that the goals of the competitive bidding statute cannot otherwise be achieved and (2) the *record demonstrates that the awarding authority undertook a careful, reasoned process to conclude that the adoption of a PLA furthered the statutory goals.*" *Callahan,* 713 N.E.2d at 961. (Emphasis added.)

We are persuaded that the reasoning of the New York and Massachusetts courts can be effectively applied in interpreting Rhode Island's competitive bidding statute. Therefore, we are of the opinion that an awarding authority may include a PLA as a bid specification in a public contract, but the awarding authority may do so only after it has established that (1) the size and complexity of the project are such that a PLA supports the goals and objectives of the state purchases act, and (2) the record demonstrates that the awarding authority has conducted an objective, reasoned study using reviewable criteria in determining that the adoption of a PLA helps to achieve the goals of the state purchases act.

If the awarding authority does so, then its decision to adopt a PLA will be entitled to the "presumption of correctness," provided by § 37–2–51. The burden then will shift to the party challenging

the decision to prove that adopting a PLA was nonetheless unwarranted for any of the reasons specified in § 37–2–51, for example, that the decision was made "in excess of the statutory authority of the agency." If, on the other hand, the awarding authority fails to conduct an objective, reasoned study before adopting a PLA, then the decision to adopt a PLA will not be entitled to the presumption of correctness and will be invalidated *ab initio.* "*Post hoc* rationalization for the agency's adoption of a PLA cannot substitute for a showing that, prior to deciding in favor of a PLA, the agency considered the goals of competitive bidding." *New York Thruway,* 643 N.Y.S.2d 480, 666 N.E.2d at 193.

In the instant case, the trial justice found that

> "an appropriate study is required so that the decision-maker can be armed with appropriate facts and not simply rely on long-held assumptions in exercising the discretion vested in him. The failure here to use studied examination of the impact of a project labor agreement on the underlying purposes and policies of the purchasing act * * * does lead, in the opinion of this Court, to an arbitrary decision predicated on a clearly unwarranted exercise of discretion without the facts upon which to base it."

The fact that some bid packages were withdrawn precipitously, then reissued with the PLA addendum, supported the finding that the procedure was arbitrary and capricious, and any alleged threats of labor unrest alone did not provide a sufficient basis on which to issue a PLA. The trial justice summed up, "[A]bsent a demonstrated, reviewable study serving as the basis for the designation of this as a PLA project, such requirement is violative of our state purchasing law."

Although an evaluative cost study is not a *per se* requirement under the state purchases act, and the state purchasing regulations do not impose such a requirement, it is our opinion that before adopting a PLA, an awarding authority must carry out an objective, reasoned evaluation that has incorporated reviewable criteria in order to fulfill the goals and purposes of the state purchases act, given a PLA's anticompetitive effect. The study should "assess[ ] specific project needs and demonstrate[ ] that a PLA [is] directly tied to competitive bidding goals." *New York Thruway,* 643 N.Y.S.2d 480, 666 N.E.2d at 191. An objective, reasoned evaluation is necessary to dispel any suggestion of caprice or arbitrariness in imposing this type of contract. Because we believe that PLAs can be imposed only after the awarding authority has carried out an evaluative study, the trial justice did not err in so finding. Our stay of the judgment in this case acknowledged the reality that contracts had been awarded and that the project was well on its way. Notwithstanding our stay of the judgment, it is our conclusion that the requirement of a PLA in a public contract can be imposed only after an evaluative study has provided evidence that the goals and purposes of the state purchases statute can thereby be achieved.

## Conclusion

In sum, the final judgment dismissed and discharged the bonds posted by the contractors. Because all contracts at issue have been awarded, the issue of injunctive relief no longer is before us. We concur with the trial justice's finding that an objective, evaluative study must precede the incorporation of a project labor agreement into a contract awarded under the state purchases act. Therefore, we deny and

dismiss the appeal, deny certiorari, quash the writ previously issued, and remand the papers in the case to the Superior Court.