[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Blue Cross Blue Shield of Rhode Island (BCBSRI) brings this action against Beverly E. Najarian, Director of the Department of Administration and Chief of Purchasing for the State of Rhode Island (the State). Plaintiff seeks a Declaratory Judgment pursuant to G.L. 1956 § 9-30-1[1]
and also requests that the Court enjoin the State from completing and implementing the award of the State's contract for health plan administration (Contract) to Intervenor, UnitedHealthcare of New England, Inc. (United). For the reasons set forth below, the Court grants Plaintiff's request for Preliminary Injunction.
This matter is continued to Friday, December 3, 2004 at 9:30 A.M. for further proceedings. At that time, the parties will have an opportunity to be heard on two issues: (1) whether the Preliminary Injunction proceeding should be ordered merged with Plaintiff's request for Permanent Injunction; and (2) the amount of security that Plaintiff shall post for the payment of such costs and damages as may be incurred or suffered by Defendant and United in the event that a subsequent Court order finds that Defendant was wrongfully enjoined.
 Summary of Decision
The Court approaches this matter with grave caution, recognizing that "government by injunction save in the most compelling cases is to be strictly avoided." Truck Away of Rhode Island, Inc. v. Macera Bros. ofCranston, Inc., 643 A.2d 811, 816 (R.I. 1994). The record before the Court includes deposition testimony from seven witnesses, as well as over twenty-seven trial exhibits. The parties have submitted memoranda of law and have presented extensive oral arguments. After consideration thereof, the Court finds compelling evidence that the procurement process was so infected with error favoring United that BCBSRI was denied fair consideration of its bid. The purposes of the State Purchasing Act and departmental regulations were thwarted by inexperienced State officials and consultants who approached this important task without bothering to familiarize themselves with the applicable law.
Defendant's decision awarding the State's contract for health plan administration to United was (1) made in violation of statutory provisions; (2) made upon unlawful procedure; and (3) was arbitrary and capricious. The Court finds overwhelming evidence that the procurement process was characterized by both a palpable abuse and a clearly unwarranted exercise of discretion.
The Court notes six specific wrongful acts committed by State officials and its consultant while they were engaged in the competitive bidding process. The six wrongful acts committed are as follows:
 1. In violation of the applicable statutory scheme and departmental regulations, the Defendant modified the Request for Proposal (RFP) after bids were submitted, without notice to BCBSRI with respect to offerors' fees for the first year of the contract. Defendant then wrongfully modified BCBSRI's bid and evaluated its proposal based upon a higher fee than the one it submitted as its offer. The State's consultant made these modifications to protect United from possible disadvantage after it had submitted a seemingly non-responsive bid.
 2. In violation of the applicable statutory scheme and departmental regulations, the State modified the RFP by eliminating a material provision pertaining to pharmacy rebates without notice to BCBSRI. United offered the State an alternate proposal that would give the state a credit against administrative fees rather than a rebate. Defendant embraced that proposal and gave BCBSRI no credit whatsoever for its offer of 100% rebate, in spite of its significant monetary value under the existing contract. The State gave United its maximum score for offering the option of a credit. That scoring had the effect of eliminating the rebate provision and modifying the RFP. The State had the opportunity to fairly modify its specifications and remove the rebate provision when the Defendant issued its "best and final" offer, but failed to do so.
 3. In violation of the applicable statutory scheme and departmental regulations, Defendant modified the RFP without notice to BCBSRI with respect to fully insured Medicare HMO rates for 2006 and 2007. The RFP specifically requests that the bidders quote rates for all three years with the understanding that they are "illustrative at this time and have not been determined by CMS, filed, and approved by the federal government at this time." (Exhibit D.) BCBSRI submitted rates for all three years. United's bid was non-responsive and provided rates for only one year, 2005. The State scored the item based solely on the quotes for 2005 and ignored the rates BCBSRI submitted for 2006 and 2007. The Court finds that Defendant's consultant made these modifications to avoid penalizing United for submitting a non-responsive bid.
 4. The State committed a palpable abuse of discretion when it penalized BCBSRI merely because the company is subject to regulation by the Rhode Island Department of Business Regulations (DBR). BCBSRI explained that it could not guarantee a portion of its quoted fees for its "Plan 65," Medigap indemnity program because it is subject to DBR approval. United is not subject to the same regulations. The Defendant met to consider rejecting BCBSRI's bid altogether as non-responsive, but opted to accept the proposal and penalize BCBSRI when evaluating its bid. The imposition of this penalty illustrates the unfairness of the process, particularly when Defendant forgave actual deviations from the RFP by United without penalizing the offeror.
 5. In violation of the applicable statutory scheme and departmental regulations, the State permitted United to modify its bid after the company submitted its "best and final" offer. With the lame excuse that the offer required clarification, Defendant contacted United after receiving its "best and final" bid and gave the company the opportunity to remove an additional charge and lower its quoted rates. United's "best and final" offer had been clear and unambiguous and did not require clarification.
 6. In violation of the applicable statutory scheme and departmental regulations, the State contacted United off-the-record in anticipation of BCBSRI's bid protest and permitted the offeror to modify its "best and final" bid regarding cross-over services.[2] When evaluating the bids, the State's consultant erroneously compared the BCBSRI bid with a lower cost option submitted by United that did not provide cross-over services. After the tentative contract award to United, BCBSRI notified the State of this error. In an effort to defeat BCBSRI's bid protest, the State wrongfully contacted United off-the-record and suggested that United modify its "best and final" offer to provide the cross-over service at no additional charge.
In enacting the State Purchases Act (Act) G.L. 1989 § 37-2-1, et seq., the General Assembly sought both to instill increased public confidence in the procedures followed in public procurement and to ensure fair and equitable treatment of all persons who deal with the system. The aforementioned violations are not the result of mistake or reasonable exercise of discretion. They are willful acts committed to ensure fair treatment to United while disregarding the rights of BCBSRI. As such, the conduct of the State strikes at the very heart of the applicable statute and its purposes.
 Facts and Travel
BCBSRI is a nonprofit hospital and medical service corporation organized under the laws of the State of Rhode Island and regulated by the DBR. See G.L. 1989 § 27-19-1, et seq. and § 27-20-1, et seq. United is a licensed HMO and health care insurer.
BCBSRI is the current vendor providing health plan administration to the State of Rhode Island for its eligible employees, retirees, and their eligible dependents. The existing three-year contract will expire on December 31, 2004. Beverly Najarian is the Director of the Department of Administration and, as such, she also serves as the Chief Purchasing Officer for the State. The award of a state health plan contract is governed by the State Purchases Act G.L. 1989 § 37-2-1, et seq. and must be awarded in accordance with the competitive bidding process set forth in the statute. The Department of Administration, Office of Purchasing has promulgated regulations to assist the Department to comply with its statutory obligations. State of Rhode Island Procurement Regulations, 1995 update. (Exhibit JJ.)
Anticipating the need for a new contract, Najarian appointed Stephen Johnston, Deputy Director of the Department of Administration, to chair an ad hoc committee known as the Technical Review Subcommittee (Committee). Najarian formed the Committee to prepare and release an RFP, to seek bids from offerors interested in procuring the award of the new contract. The Committee was also charged with the responsibility of receiving, analyzing, and scoring the proposals to determine the winning bidder. Her own involvement in the bidding process was limited and indirect, and she delegated the responsibility for the project to Johnston, the State official, who managed the process. (Najarian Dep. at 7, 11, and 12.)
Johnston engaged the services of a consulting firm, Hewitt Associates, LLC (Hewitt), to draft the RFP, review the bids, analyze and score them. Robert Kennedy is the Hewitt associate, who was in charge of the project. Johnston relied heavily on Kennedy's expertise and testified that "we were relying on the advice of the real professionals." (Johnston Dep. at 102.) The Committee accepted Hewitt's analysis and scoring and it essentially adopted Kennedy's recommendations. (Johnston Dep. at 112.) Johnston had no prior experience in procurement processes. The only other procurement he had ever handled had involved the selection of Hewitt as consultant for this job. (Johnston Dep. at 6.) At no time did Johnston ever review the Act or the Regulations in connection with the health plan contract bid process. (Johnston Dep. at 12-14.)
Although Robert Kennedy and his firm may have had significant experience in the field of employee health care benefits, neither Kennedy nor his firm had ever performed consulting services in connection with a governmental procurement contract. (Kennedy Dep. at 10-11; Exhibit 1.) Like Johnston, Kennedy never reviewed the applicable statutes or regulations in preparation for or in connection with his work on the project. (Kennedy Dep. at 11.)
Aside from conducting the bidding process, the State also is obligated to ensure compliance with the Act and departmental regulations. A new Department official, William Anderson, assumed the responsibility of monitoring the process because two other Department officials, the Purchasing Agent and the Administrator of Purchasing Systems, were out on medical and administrative leave respectively. (Najarian Dep. at 7-8; Anderson Dep. at 11.) Anderson had never reviewed the RFP because it was prepared before he became involved in the project. Thereafter, he had little time to perform a detailed review of the RFP because he was overworked, handling his own job responsibilities along with those of his two absent co-workers (Anderson Dep. at 27).
Anderson's role was extremely limited. He attended the opening of the sealed bids, confirmed that they were submitted timely and reviewed a three-page bidder certification cover form to determine that the proposals appeared responsive. He did not review the actual bids. (Anderson Dep. at 15, 28, and 29.) Anderson acted mainly as a conduit of information and documents exchanged between the bidders and Johnston. (Anderson Dep. at 23.)
The RFP requested proposals for a three-year contract covering three populations of the State's active employees, retirees, and their eligible dependents. Population I consists of active employees. Population II consists of early retirees, under the age of 65. The RFP requested quotes for populations I and II for two separate types of plans: one that included medical and pharmacy and another that only included medical coverage. Population III consists of retirees, aged 65 and over. The RFP requested quotes for population III for two optional plans, a fully insured Medicare HMO and a Medigap Indemnity plan. (Exhibit D.) The RFP provides:
 "Proposal Requirements — Potential offerors are cautioned that proposals must conform to the specifications of the RFP. Each offeror must submit two (2) proposals: (1) Self-Insured PPO option for Populations I and II, and (2) Fully Insured Medicare HMO and Self-Insured Medigap Indemnity options for Population III. Offerors are required to submit proposals for each of the first three (3) years of the contract." (Exhibit D.)
On July 8, 2004, the State issued the RFP, which solicited proposals for a three-year contract beginning January 1, 2005. (Exhibit D.) Only two bidders, United and BCBSRI, submitted sealed proposals by the August 12, 2004 deadline. (Exhibits E and F.) The bids were opened in public by Anderson, as required by the Act.
On August 20, 2004, the State issued to both bidders follow-up questions, to which each bidder responded. (Exhibits G, H, I and J.) Thereafter, representatives from Hewitt and the State, including Johnston, conducted two recorded telephone conversations with United and one with BCBSRI, wherein the bidders were asked further "clarifying" questions. (Exhibits J1, J2, and J3). On September 20, 2004, the State addressed to the bidders additional follow-up questions, to which they responded. (Exhibits K, L, and M.)
The RFP set forth certain "assumptions and requirements" to be used by each offeror in preparing its responses. "Those assumptions and requirements" included the following: "1. The new Contract will cover all claims incurred on and after January 1, 2005. The prior claims run-off will be paid under the existing contracts. Please quote an immature fee for year one (1) of the contract." (Exhibit D.)
The RFP specifically requested that the bidders quote "immature" fees for the first contract year. BCBSRI is obligated under its current contract to process claims pending as of January 1, 2005. Since those claims will be paid under the current contract, it will reduce the number of claims processed in 2005 under the new contract. For that reason, fees for the first year of the new contract are considered "immature" whereas fees for the second and third years of the new contract are considered "mature."
BCBSRI complied with the RFP and quoted an "immature" fee for 2005 and a mature fee for 2006 and 2007. (Exhibit F). BCBSRI also provided a higher "mature" fee for purposes of comparison for 2005 and clearly indicated that the fee was submitted for illustrative purposes only. It was listed on a separate colored column from actual proposed fees for 2005, 2006, and 2007. BCBSRI's proposal stated that it was quoting an "immature" fee for year one. (Exhibit F). BCBSRI reiterated this fact in response to follow-up questions it received from the State. BCBSRI was asked the following question:
 "Please confirm whether the administrative fees quoted are mature or immature." (Exhibit G.)
 BCBSRI replied:
 "The administrative fees quoted for 2005 were illustrated on both a mature and immature basis for comparison purposes. The State would be billed the immature rate for 2005. The rate for years 2006 and 2007 were illustrated on a mature basis only." (Exhibit I.)
United answered the same question by stating that "the administrative fees quoted are mature." (Exhibit H.) The State accepted United's response and did not view it as non-responsive. To avoid placing United at a disadvantage, Kennedy modified the RFP by eliminating the requirement that the offerors quote "immature" fees for 2005. He then disregarded BCBSRI's actual bid for 2005 and scored the company based upon the higher "mature" quote that it had supplied for comparison purposes only.
Counsel for United indicated to the Court in oral argument that his client actually had quoted a lower figure for the first year in spite of having characterized it as "mature." This fact makes Kennedy's conduct even more prejudicial to BCBSRI because he compared United's lower quote with the higher figure he attributed to BCBSRI.
During his deposition, Kennedy was questioned at length about this switch. He was a poor witness when he attempted to justify why he modified a responsive bid to match a seemingly non-responsive one. His testimony was inconsistent with that of Johnston on the same issue. Kennedy made a feeble effort to explain United's error by trying to explain that it took into account the fact that the winner of the new contract would have to run-off claims after its expiration. (Kennedy Dep. at 85-86.) In fact, United provided a complex run-off formula in its initial bid proposal, and it is clear that United did not intend to run-off claims in 2008 based upon 2005 rates. (Johnston Dep. at 61; Exhibit E.)
Kennedy's testimony was particularly incredible when he attempted to deny that BCBSRI had specified that the amount the State would pay under its bid for 2005 was the number listed under the "immature" column. (Kennedy Dep. at 84). Having failed to successfully advance that proposition, Kennedy said that "We wanted to be sure that in our financial comparison we compared apples to apples." (Kennedy Dep. at 85.)
The State modified the RFP without notice to BCBSRI a second time when it abandoned its interest in obtaining a proposal for pharmacy rebates. Under the current contract, the State receives 100% of the rebates paid to BCBSRI's pharmacy benefits manager by pharmaceutical companies. In 2003, the rebates totaled approximately $1,600,000. In the current year of 2004, they will total $2,000,000.
Section 8.6 of the RFP, entitled "Pharmacy Financials," directs the bidders to indicate the percentage of rebates (from 0%-100%) that they are willing to return to the State. The RFP also asks the offerors to indicate whether or not they would guarantee the rebates, but does require a guarantee as a condition of offering a rebate. (Exhibit D.) BCBSRI stated that it would return 100% of its rebates. United indicated that it would return 80% of its rebates. Neither offeror agreed to guarantee the payments.
United also provided a second option whereby the firm would retain all rebates, but would provide the State with a credit of $4.50 off the administrative fee per employee per month. (Exhibits E and J3.) That credit would total approximately $1,000,000 per year. (Johnston Dep. at 55.) Without notice to BCBSRI, the State decided to eliminate the rebate provision from its RFP. The Defendant disregarded BCBSRI's offer to return 100% of its rebates to the state and gave BCBSRI no credit whatsoever when scoring the proposals on the rebate offer. Johnston testified:
 "Q. Did you ever compare that million dollar number with what the State had actually received under the existing plan pursuant to which the State was receiving 100 percent of rebates?
 A. Yes, we did.
 Q. Okay. And can you describe the comparison that you made?
 A. Yes. What we did was valued again the 4.50 to translate at $1 million and we valued the 100 percent of nothing is nothing."
 Q. I thought you told us before that you were aware that the state had received a $1.6 million payment?
 A. It wasn't a guarantee. There is no promise in the future that would be the case." (Johnston Dep. at 55.)
 "Q. . . . the analysis basically is assuming under the Blue Cross scenario that the value of 100 percent of the rebates is zero, correct?
 A. Yes." (Johnston Dep. at 105.)
Kennedy testified that he viewed the rebate offers of both BCBSRI and United as having similar value because neither offer was guaranteed. (Kennedy Dep. at 102-103.) From a mathematical standpoint, the difference between the offers is 20% or $400,000 for a year such as 2004 when the rebates total $2,000,000. By equating the two proposals, it is clear that Kennedy effectively deleted the provision contained in the RFP pertaining to rebates in favor of an alternative proposal.
Kennedy's testimony regarding the value of BCBSRI's rebate offer appeared particularly disingenuous when he acknowledged that Hewitt had projected that pharmacy rebates in general will remain at the same level in 2005 as in 2004. (Kennedy Depo. at 101.) He conceded that he did not know whether the State ever received guarantees of pharmacy rebates in the past. (Kennedy Dep. at 76.) In fact, BCBSRI does not guarantee the rebates under the existing plan.
Kennedy's scoring of the bids which gave BCBSRI no credit whatsoever for offering a 100% rebate prejudiced BCBSRI because the company had reason to rely on the provisions of the RFP when calculating its administrative fees. It was tantamount to modifying the RFP without notice to BCBSRI.
Johnston testified that the State did not go back to BCBSRI and invite the company to bid on the alternative specification of a credit to the administration fee in lieu of rebates because it would not have been fair to United. "It would have been sharing confidential information with a bidder." (Johnston Dep. at 55-56.) In fact, the State had an opportunity to modify the specifications and remove the request for a bid on pharmacy rebates when it had requested a "best and final" offer from the bidders on September 20, 2004. Under the Act, subsequent requests for proposals are expected to be based upon revised specifications or quantities. See
G.L. 1989 § 37-2-20.
The State modified the RFP again when United failed to quote fees for 2006 and 2007 under the fully insured Medicare HMO program. BCBSRI and United are both subject to federal regulations with respect to their fully insured Medicare HMO programs. As such, neither bidder could guarantee its fees for that program option. The RFP recognizes this limitation and provides that "The State understands rates are illustrative at this time and have not been determined by CMS, filed, and approved by the federal government at this time." (Exhibit D.) The RFP, as well as the actual form that includes the aforementioned language, expressly requests quotes for 2005, 2006, and 2007. (Exhibit D.) Nonetheless, without explanation, United only provided quotes under this section for year one, 2005. (Exhibit E.) BCBSRI provided quotes for all three years. (Exhibit F.)
Rather than view United's bid as non-responsive, Kennedy disregarded BCBSRI's quotes for 2006 and 2007 and scored the item based solely on year one. (Kennedy Dep. at 73-74.) Johnston attempted without success to distinguish United's failure to provide quotes for 2006 and 2007 from filing a non-responsive bid because the rates were subject to CMS filing and approval by the federal government. (Johnston Dep. at 52.)
The State was far less generous in its treatment of BCBSRI than it was in its treatment of United when the Defendant manufactured an issue to suggest that BCBSRI's bid was non-responsive. The State actually penalized BCBSRI because it is subject to DBR regulations. As it relates to its "Plan 65" Medigap indemnity program, DBR requires BCBSRI to make a reserve contribution to guarantee that it will be able to perform its obligations under its contracts. The portion of administrative fees for the Medigap indemnity program representing reserves must be approved by DBR. Accordingly, BCBSRI cannot guarantee its fees for the Medigap indemnity program and has no legal ability to do so. On September 24, 2004, Anderson emailed BCBSRI, inquiring whether the fees were guaranteed. (Exhibit Q.) BCBSRI responded:
 "Because Plan 65 is highly regulated and often involves public hearings, we cannot guarantee the reserve level for 2006 and 2007. It is important to note that the State Department of Business Regulations will be approving the reserve factor to be used in 2006 and 2007. Additionally, Blue Cross is guaranteeing the administrative portion of the retention for all three years. This represents the majority of the retention dollars for the Plan 65 product." (Exhibit T.)
In spite of this explanation, Najarian and Kennedy met with Johnston's Committee to discuss whether to reject BCBSRI's bid as non-responsive. It was the only Committee meeting Najarian attended. Those present considered "whether (BCBSRI) would be decreed a non-responsive bidder or not." (Najarian Dep. at 22.) Ultimately, the Committee determined that they "were going to allow it to pass." (Najarian Dep. at 24.) However, Hewitt penalized BCBSRI when analyzing and scoring its proposal based upon its inability to guarantee its Medigap fees. (Exhibit U.)
The Committee never addressed any concerns about whether United's bid was non-responsive. (Najarian Dep. at 23.) When scoring United's bid, Kennedy did not penalize United for failing to comply with the verbatim terms of the RFP. Kennedy merely modified the RFP to conform to United's non-conforming bid. In spite of the examples previously discussed, the State insists that United's bid was responsive. (Exhibit FF.)
On September 20, 2004, at the request of Johnston, Anderson asked each of the bidders to submit a "best and final offer" with respect to their cost proposals.[3] In his email to the bidders, Anderson advised them that they should "only address changes from the original proposal." (Anderson Dep. at 45; Exhibit N.)
Both offerors replied to the request for a "best and final" offer. Contrary to statutory provisions, the revised bids were not opened in public. See G.L. 1989 § 37-2-18, 37-2-20, Regulations 6.3.4.3. United's "best and final" offer included certain changes to its quote under Section 8.1 of the RFP, Administrative Fees. (Exhibit O.) One change was to exclude the "24 Hour Nurse Line" from its quoted fee and to offer the service at an additional charge of $.99 per employee, per month. United's initial bid had included this service in its fee.
Upon receipt of the revised bids, Hewitt prepared so-called "clarification" questions for Anderson to email to both bidders. (Johnston Dep. at 93.) United's "best and final" offer with respect to excluding the "24-Hour Nurse Line" from the quoted administrative fee had been clear and unambiguous. A reproduction of their response is set forth below:

---------------------------------------------------------------------------------------------------
| | | | If excluded, additional |
| | Included | Excluded | PEPM Charge |
|-------------------------------------------------|----------|----------|--------------------------|
| Claims Processing | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Network Access | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Utilization Management (Care Coordination) | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Care/Case Management | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Wellness Programs | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Disease Management | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Dedicated Toll-Free Telephone Line | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| 24 Hour Nurse Line | | | $0.99 pepm |
|-------------------------------------------------|----------|----------|--------------------------|
| Plan Documentation Preparation | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Plan Documentation Printing | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Distribution of Provider Directories | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Claim Fiduciary | | | $0.55 pepm |
|-------------------------------------------------|----------|----------|--------------------------|
| Reporting | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Open Enrollment Materials | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Communication Materials | | | |
|-------------------------------------------------|----------|----------|--------------------------|
| Other (please be sure to separately itemize any | | | Please see Financial |
| additional charges, if applicable) | | | Commentary |
---------------------------------------------------------------------------------------------------
Note: replication

Nonetheless, Hewitt's question to United suggested that the quote required clarification. In his email to United, Anderson asked the offeror to "confirm that the 24-hour nurse line services are included in the `Best and Final' base ASO fee and no additional fee applies." (Exhibit R.) United responded that they would provide the service in their fee without additional charge, thereby waiving the $.99 fee per employee, per month. (Exhibit S.) Hewitt's question clearly served as a suggestion to United that the company should reconsider changing the fee listed in the initial bid and modify its "best and final" offer. Again, Defendant violated the statute and departmental regulations to assist United in making its bid more attractive and competitive.
After Hewitt received the responses from Anderson, the consultant analyzed and scored the proposals. (Johnston Dep. at 96.) Based upon his scoring of the two final bids, Kennedy determined that United should be awarded the contract.
By statute, a three-member committee, known as the Architectural, Engineering and Consultant Services Committee (AE Committee) must approve major public contracts. With respect to this procurement, Anderson and Johnston served on the AE Committee along with a third public member. See G.L. 1989 § 37-2-59. The AE Committee had no more than a formal role, and the public member was not involved in the process other than to attend one brief meeting for the purpose of voting to approve Hewitt's recommendations without reviewing the RFP or the bids.[4]
(Tarnowsky Dep. at 21 and 24.) After the AE Committee approved Hewitt's recommendation, Anderson sent a letter to United advising the company that it had been "tentatively selected by the Chief Purchasing Officer for the `State Employees Health Care Administrative award (Bid# B04036).'" (Exhibit BB).
The State's conduct after making the tentative bid award was also in violation of the applicable statute and departmental regulations. The State urged United to modify its bid pertaining to cross-over services under the Medigap indemnity plan to counter BCBSRI's anticipated bid protest. The State's conduct was wrongful, and those who testified on behalf of the State pertinent to this issue lacked credibility and appeared to have been motivated by reasons independent from obtaining the best contract for the State.
Certain background information is necessary to put this issue in context. With respect to Medicare Medigap indemnity plans, cross-over services eliminate the retiree's need to submit two claim forms: one to Medicare and another to the provider of the indemnity plan. Instead, all of the retiree's claims are electronically submitted both to Medicare and to the indemnity provider. (Exhibit J3.)
BCBSRI's quoted fee for the Medigap indemnity option includes cross-over services. BCBSRI's bid did not identify the service as part of its bid because it considers cross-over services incidental to Medigap indemnity plans. BCBSRI has included crossover services in its plans for over twenty years. (Boyd Dep. at 22-26.)
United offers cross-over services at an additional fee. In its proposal, United offered two options under its Medigap indemnity plan, a lower cost option that excluded the benefit and a higher rate that included cross-over services. United would offer cross-over services for a one time $1.10 charge per retiree and an additional $4.50 charge per month per retiree. (Exhibit E.)
Krista Morris, a representative of Hewitt, reports to Kennedy. On August 24, 2005, Morris spoke to a representative from BCBSRI as part of the State's follow-up communications after receiving the initial bids. (Exhibit J1.) She never asked BCBSRI whether its fee included cross-over services in spite of the fact that she viewed the service as "pretty common." (Exhibit J3.)
However, the next day, she had a conference call with representatives of the State and representatives of United. (Exhibit J3.) She raised the issue of cross-over services and discussed it at great length in that telephone call. She and Sue Robinson, United's underwriter, reviewed the meaning of cross-over services, the fact that United was offering them at an additional fee, and the amount of that fee.
Kennedy scored the competing bids by comparing United's lower quote that excluded cross-over services with BCBSRI's quote that included cross-over. The mere fact that Hewitt did not feel it necessary to clarify whether BCBSRI included the service in its fee is another example of treatment that favors United. There was a material difference in the two options offered by United, and this error placed BCBSRI at a disadvantage.
Upon learning that the contract had been awarded to United, James Purcell, the acting CEO of BCBSRI, wrote a letter to the Governor complaining about the award. In his letter, he notified the State that Kennedy had erred in his comparing United's lower fee without cross-over services with BCBSRI's bid, which included the services. (Exhibit CC.)
After receiving this letter, Kennedy initiated an unrecorded telephone conversation with United's representative, Patrick O'Brien, urging him to modify United's bid to cure any problem created by Hewitt in its scoring. It is clear that this request was made to help defeat BCBSRI's anticipated bid protest. (O'Brien Dep. at 14.) O'Brien testified:
 "I received a phone call from Mr. Kennedy and we discussed the letter and we discussed Medicare crossover, and in order to make the whole issue go away, we said that we had the ability to offer Medicare crossover at no cost, if that's what the state wanted." (O'Brien Dep. at 15.)
Kennedy was asked about the conversation at his deposition, but he was less than candid in his responses. He attempted to excuse the inappropriate communication by contending that United's bid regarding cross-over services was unclear, which it was not. He testified that the spirit of the telephone conversation was
 ". . . our trying to understand United's quote with and without Medicare crossover . . ." (Kennedy Dep. at 96.)
 "Part of the conversation — the original conversation was the four dollar and something fee didn't seem to — didn't make sense to us, didn't seem to make sense to him (O'Brien) either. He wanted to clarify that fees along with the dollar ten per solicitation. The return call he indicated the . . . fee included crossover services. . . . In essence waiving the fee, clarifying the $4 was inappropriately labeled and waiving the $1.10." (Kennedy Dep. at 96-97.)
Only after counsel for BCBSRI continued to press the issue did he finally admit that O'Brien modified the bid to waive the additional fee for cross-over services. (Kennedy Dep. at 97.)
Johnston was equally evasive when questioned about the cross-over issue. He had participated in Krista Morris' August 25th conference telephone conversation with United. Another member of his Committee, State official Joseph Cembrola, was also on the line. Cembrola specifically requested a definition of cross-over services, and Robinson and Morris both responded to his inquiry. (Exhibit J3.)
Johnston claims that he does not recall the telephone discussion on the subject. (Johnston Dep. at 122.) The portion of the telephone conversation that addressed cross-over services covers seven pages of a 27-page transcript. (Exhibit J3 at 5, 11-17.)
Johnston also testified that the State did not care about cross-over services. Johnston stated:
 "[W]e never cared about — that was never part of the procurement process to have crossover services. I think I've testified earlier that we didn't even know what it was, it was not part of the RFP process, ever." (Johnston Dep. at 122.)
This statement is at odds with Hewitt representative, Krista Morris' comments during the August 25th telephone call during which she stated:
 ". . . instead of holding those claims and then the delay in claim payment, the crossover is pretty common. There is an additional fee, and this is probably a conversation takeoff line; that's something that the State would be interested in." (Exhibit J3.)
Johnston also attempted to distance himself from the unrecorded communication between Kennedy and O'Brien when he testified: ". . . let me say one thing, the State did not have any direct contact with Patrick (O'Brien). Our discussions were with Hewitt. I want to make that clear." (Johnston Dep. at 125.)
United's bid as it relates to cross-over services was clear and unambiguous. The August 25th follow-up telephone conversation was likewise clear, and it focused in large part on United's additional fee for cross-over services. By urging United to modify its bid in the face of a bid protest, the State was engaging in wrongful conduct for the purpose of defeating a bid protest, thereby interfering in the appeals process and displaying favorable treatment toward United.
Najarian referred BCBSRI's bid protest to her legal counsel and had little involvement in replying to the protest other than signing the response letter. (Najarian Dep. at 42-43.) On October 26th, she denied the bid protest. (Exhibit FF.) She addressed four issues that had been raised by BCBSRI in its protest: (1) the comparative cost of the United bid and the BCBSRI bid, including the issue of pharmacy rebates; (2) the question of whether the United bid was non-responsive; (3) under which plan the retirees would pay a higher or lower cost; and (4) cross-over services. She found that the United's bid was more advantageous than BCBSRI's bid from an overall cost standpoint. She found that United's bid was responsive. She found that United's plan would result in a majority of retirees paying a level and lower cost and a minority of retirees paying a slightly higher cost. Najarian also found that Medicare cross-over services were not a requirement in the RFP, but that United had agreed to provide them at no additional charge.
Following receipt of Najarian's response to its bid protest, BCBSRI commenced the instant action seeking a Temporary Restraining Order and Preliminary Injunction. The Court denied the request for Temporary Restraining Order and assigned the case for hearing on Preliminary Injunction.
 State Purchases Act and Departmental Regulations
In 1989, The General Assembly enacted the "State Purchases Act", G.L. § 37-2-1, et seq. That Act governs the procurement process in the instant matter. The Act provides that it "shall be liberally construed and applied to promote its underlying purposes and policies." Those purposes and policies, in pertinent part, are as follows:
 "(a) Simplify, clarify, and modernize the law governing purchasing by the state of Rhode Island and its local public agencies;
 (d) Provide for increased public confidence in the procedures followed in public procurement;
 (e) Insure the fair and equitable treatment of all persons who deal with the procurement system of the state;
 (f) Provide increased economy in state and public agency procurement activities by fostering effective competition;
 (g) Provide safeguards for the maintenance of a procurement system of quality, integrity and highest ethical standards; and
 (h) Ensure that a public agency, acting through its existing internal purchasing function, adheres to the general principles, policies and practices enumerated herein." G.L. 1989 § 37-2-2.
The Department of Administration Office of Purchasing promulgated regulations to provide a "framework" for implementing the letter and intent of State Purchasing Act. State of Rhode Island Procurement Regulations, 1995 update. (Exhibit JJ.) The Regulations require that each agency director be "familiar with these regulations and must indoctrinate his/her personnel in their implementation." (Exhibit JJ.) Najarian did not follow this mandate, and neither Johnston nor Kennedy ever read the statute or regulations. (Johnston Dep.; Kennedy Dep.)
The Regulations require verbatim compliance with the Act:
 "1.1.2.3 Responsibility and Accountability: All state agency officials shall be responsible for verbatim compliance with purchasing legislation enacted by the General Assembly and with all related policies, rules, regulations, procedures and codes promulgated by the Chief Purchasing Officer and shall be held accountable for violations of the spirit, intent and letter of these governing requirements. All state employees shall be responsible for carrying out their designated functions with care, integrity and a sense of responsibility to the taxpayers of Rhode Island for providing public services in the most costeffective manner possible." (Exhibit JJ.)
Both the Act and the Regulations define a "responsive bidder":
 "G.L. 1989 § 37-2-15(7) `Responsive bidder' shall mean a person who has submitted a bid under § 37-2-20 which conforms in all material respects to the invitation for bids, so that all bidders may stand on equal footing with respect to the method and timeliness of submission and as to the substance of any resulting contract.
 Regulation 5.1.21 `Responsive Bidder' shall mean a person who has submitted a bid under section 37-2-20
of this chapter which conforms in all material respects to the invitation for bids, so that all bidders may stand on equal footing with respect to the method and timeliness of submission and as to the substance of any resulting contract. For the purposes of establishing rules and regulations pursuant the Chapter 37-2, a `responsive bidder' shall also mean a bid which conforms in all material respect to the terms and conditions, specifications and any other requirements of the Bid Invitation. (Exhibit JJ.)
 Regulation 5.4.6.2 Unless alternate offers are clearly requested or allowed, only those offers which are responsive, in all material respects, to the terms of the solicitation shall be considered.
 Regulation 5.4.6.2.2 Alternate specifications may be considered only where it has been determined that the alternate satisfies all objective performance characteristics of the procurement and represents a reduction in expenditure;. . . ."
The Act requires that the bids are to be awarded by competitive sealed bidding and describes the components of that process. That section provides, in pertinent part:
 G.L. 1989 § 37-2-18. Competitive sealed bidding
 (4) Bids shall be opened publicly at the time and place designated in the invitation for bids. Each bid, together with the name of the bidder, shall be recorded and an abstract made available for public inspection. Subsequent to the awarding of the bid, all documents pertinent to the awarding of the bid shall be made available and open to public inspection and retained in the bid file. . . .
 (6) Correction or withdrawal of bids may be allowed only to the extent permitted by regulations issued by the chief purchasing officer.
The Regulations also require that bids shall be opened publicly at the time and place designated in the invitation for bids. Regulation 5.11.1.3
The Act provides a mechanism for negotiations after unsuccessful competitive sealed bidding:
 (1) In the event that all bids submitted pursuant to competitive sealed bidding under § 37-2-18 result in bid prices in excess of the funds available for the purchase, and the chief purchasing officer determines in writing:
 (a) That there are no additional funds available from any source so as to permit an award to the lowest responsive and responsible bidder, and
 (b) The best interest of the state will not permit the delay attendant to a resolicitation under revised specifications, or for revised quantities, under competitive sealed bidding as provided in § 37-2-18, then a negotiated award may be made as set forth in subsection (2) or (3) of this section.
 (2) Where there is more than one bidder, competitive negotiations pursuant to § 37-2-19, shall be conducted with the three (3) (two (2) if there are only two (2)) bidders determined in writing to be the lowest responsive and responsible bidders to the competitive sealed bid invitation. Such competitive negotiations shall be conducted under the following restrictions:
 . . .
 (b) A request for proposals, based upon revised specifications or quantities, shall be issued as promptly as possible, shall provide for an expeditious response to the revised requirements, and shall be awarded upon the basis of the lowest bid price, or lowest evaluated bid price submitted by any responsive and responsible offeror. G.L. 1989 § 37-2-20.
The Regulations, but not the statute, give the Purchasing Officer the opportunity to request a "best and final" offer:
 Regulation 6.3.4 Request for Best and Final Offer
 Regulation 6.3.4.1 On the basis of discussions with offerors, a request for Best and Final Offer, which describes the requirements of the procurement in the final form, shall be issued to all offerors still under consideration.
 Regulation 6.3.4.2 Each offeror shall submit a Best and Final Offer, which defines their best price, and other terms, for the procurement.
 Regulation 6.3.4.3 Best and Final Offers shall be evaluated in the same fashion as a normal competitive bid.
 G.L. 1989 § 37-2-51. Decision presumed to be correct
 The decision of any official, board, agent, or other person appointed by the state concerning any controversy arising under, or in connection with, the solicitation or award of a contract, shall be entitled to a presumption of correctness, and shall not be disturbed unless the decision was procured by fraud; in violation of constitutional or statutory provisions; in excess of the statutory authority of the agency; made upon unlawful procedure; affected by other error of law; clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
 G.L. 1989 § 37-2-52. Authority to resolve protests
 (1) The chief purchasing officer or his or her designee shall have authority to determine protests and other controversies of actual or prospective bidders or offerors in connection with the solicitation or selection for award of a contract.
 (2) Any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or selection for award of a contract may file a protest with the chief purchasing officer. A protest or notice of other controversy must be filed promptly and in any event within two (2) calendar weeks after such aggrieved person knows or should have known of the facts giving rise thereto. All protests or notices of other controversies must be in writing.
 (3) The chief purchasing officer shall promptly issue a decision in writing. A copy of that decision shall be mailed or otherwise furnished to the aggrieved party and shall state the reasons for the action taken.
 G.L. 1989 § 37-2-53. Written determination for continuation of the procurement
 In the event of a protest timely filed under § 37-2-52(2) of this chapter, the state shall not proceed further with the solicitation or award involved, until the chief purchasing officer makes a written and adequately supported determination that continuation of the procurement is necessary to protect substantial interest of the state.
It is well settled that "[i]f a statute expressly delegates power to interpret and define certain legislation to an agency, regulations promulgated pursuant to that power are legislative rules having the force of law." Lerner v. Gill, 463 A.2d 1352, 1358 (R.I. 1983); see alsoParkway Towers Associates v. Godfrey, 688 A.2d 1289 (R.I. 1997). Accordingly, departmental regulations have the force of law and state officials are required to follow them.
 Standard of Review
Rhode Island General Laws § 37-2-51 governs the Superior Court's scope of review for an appeal of a contract award granted in accordance with the State Purchases Act. G.L. 1989 § 37-2-51. The statute provides that the decision shall be entitled to a presumption of correctness and shall not be disturbed unless:
 (1) the decision was procured by fraud;
 (2) in violation of constitutional or statutory provisions;
 (3) in excess of the statutory authority of the agency;
 (4) made upon unlawful procedure; affected by other error of law;
 (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
 (6) or arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
When the legislature enacted G.L. 1989 § 37-2-51, it clearly intended for judicial review of procurement decisions, albeit under limited circumstances. Other than the first ground, that the award was procured by fraud, the five remaining grounds track the standard of review of contested cases under the Administrative Procedures Act (APA). See G.L. 1956 § 42-35-15(g). However, agency decisions under the APA are not accorded a presumption of correctness. Our Supreme Court has construed the term "presumption of correctness" narrowly to discourage the trial court from interfering with the competitive bidding process.
The seminal case which addresses the scope of judicial review of the competitive bidding process is Gilbane Building Co. v. State CollegesBd., 17 R.I. 295, 267 A.2d 396 (1970). Gilbane was decided before the General Assembly enacted the State Purchases Act. However, the Court has reaffirmed the standard of review set forth in Gilbane in later holdings. See H.V. Collins Company v. Tarro, 696 A.2d 298 (R.I. 1997).
The Gilbane case involved a dispute between two general contractors, Gilbane Building Co. (Gilbane) and Dimeo Construction Company (Dimeo), over who should be awarded the contract to build the Warwick campus of Rhode Island Junior College. The RFP sought bids from general contractors and subcontractors. The general contractors were required to submit their bids, along with a list of the names of subcontractors whom they intended to employ. Unbeknownst to Dimeo, within hours before the bids for general contractor were scheduled to be submitted and opened, two subcontractors whom Dimeo intended to employ withdrew their bids. Dimeo's bid was much lower than Gilbane's bid, but it was based upon sub-bids that had been withdrawn. The State permitted Dimeo to amend its bid to include prices from subcontractors who had not withdrawn their bids. Their amended bid was higher than the initial bid, but it was still lower than Gilbane's bid, and Dimeo was awarded the contract. Gilbane sought to enjoin the award by arguing that the State had no authority to alter the terms of a sealed bid once it has been opened.
The court rejected Plaintiff's argument and stated that one "charged with the responsibility of safeguarding the public interest should have his discretion shackled once the bids are opened." Gilbane Building Co.,107 R.I. at 299, 267 A.2d at 399. The Court held that in the absence of any legislative requirement pertaining to competitive bidding, the public officials are duty-bound to act honestly and in good faith as they determine which bidder would best serve the public interest.
 "The judiciary will interfere with an award only when it is shown that an officer or officers charged with the duty of making a decision has acted corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion." Gilbane Building Co., 107 R.I. at 300, 267 A.2d at 399.
The Court concluded that the circumstances which led to the mistaken calculations were made in good faith, and Dimeo's representative was completely unaware that the subbids had been withdrawn. The Court concluded:
 "We have long presumed that public officers will perform their duties properly. It is our belief that courts can and will recognize corruption, bad faith, or a manifest abuse of discretion when it appears from the evidence presented in a case. Nevertheless, when officials in charge of awarding a public work's contract have acted fairly and honestly with reasonable exercise of sound discretion, their actions shall not be interfered with by the courts." Gilbane Building Co., 107 R.I. at 302, 267 A.2d at 400.
Several cases, following Gilbane, have provided the Court with guidance as to what factual situations fall short of palpable abuse of discretion. In H.V. Collins Company v. Tarro, 696 A.2d at 298, the Court upheld the award of a school construction and renovation project to the third lowest bidder. The Court found that the awarding authority carefully considered factors other than mere cost, such as expertise, qualifications and quality of work and determined that the winning bidder was the best contractor for the project. These criteria were sufficiently objective, measurable, and enunciated in the RFP.
In an earlier case, Goldman v. Burns, 109 R.I. 236, 283 A.2d 673
(1971), the Court also upheld the award of a municipal contract for the purchase of 13 police cruisers to the second lowest bidder. The difference in cost between the lowest bidder and the winning bidder was relatively small. The winning bidder sold Chevrolets while the lowest bidder sold Dodge automobiles. The existing police department fleet consisted of 33 Chevrolets, and the department wanted to keep its fleet uniform. The Court upheld the award as the exercise of good faith discretion.
In Goldman, the Court noted that the Plaintiffs did not present any evidence of corruption, bad faith, or palpable abuse of discretion. The Court stated: "That defendants may have been guilty of that kind of conduct in this case is not event hinted at, much less shown, and the complaint must therefore fail." 109 R.I. at 240, 283 A.2d at 676.
In the instant case, counsel for BCBSRI have vigorously argued that the State committed a palpable abuse of discretion, but have carefully avoided arguing that the State's conduct was tantamount to bad faith. However, while avoiding the terminology, counsel have presented evidence of unfair treatment and conduct that resulted in favor toward United and bias against BCBSRI. That evidence distinguishes the instant case fromGilbane and its progeny.
In Truk Away of Rhode Island Inc., 643 A.2d at 811, the trial justice granted Plaintiff's request to enjoin the award of a sanitation contract to a competing bidder. The trial justice found the specifications and addenda were so confusing that it constituted a "palpable abuse of discretion." The Supreme Court disagreed. The Court noted that modern state and municipal contracts, such as the sanitation contract in question, are often complicated and contain numerous provisions and alternatives, as well as clarifying agenda. Even if the bidding process were confusing, it was not arbitrary or capricious. The Court cautioned the Superior Court to avoid finding a palpable abuse of discretion "[i]n the absence of bad faith or corruption" or "more compelling evidence of arbitrariness or capriciousness than may be found in mere complexity."Id. at 816. The Court admonished trial judges to "exercise great care before issuing an injunction vacating an award of either a state or municipal contract." Id. The Court also stated: "We do not believe, however, that those whose duty it is to contract for the construction of a public improvement should be placed in a legalistic straitjacket." Id.
at 815.
This Court, ever mindful of that admonition, has proceeded with grave caution in determining whether Plaintiff has offered sufficient evidence to rebut the presumption that State officials and the State's consultant performed their duties properly. The Court in Gilbane expressed confidence in the trial court to recognize whether an "awarding authority has `acted corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion.'" H.V. Collins Company,696 A.2d at 302 (citations omitted.)
The distinction among corruption, bad faith and palpable abuse of discretion refers to motive rather than to the nature of the wrongful conduct. Generally, the term, "corruption," suggests that the offender committed wrongful acts to obtain some benefit for himself or herself, such as a monetary benefit.
Black's Law Dictionary (6th ed. 1990) defines "corruption" as
 "[a]n act done with an intent to give some advantage inconsistent with official duty and the rights of others. The act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person contrary to duty and the rights others."
The term, "bad faith," is similar to corruption, but the offender may be motivated by ill will or dishonesty, but not necessarily self interest.Black's Law Dictionary defines "bad faith" as
 "[t]he opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term `bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will."
The term, "abuse of discretion," involves wrongful, unreasonable, arbitrary and even unconscionable conduct, but it does not require proof of self-interest or ill will on the part of the offender. Black's LawDictionary defines "abuse of discretion" as
 "failure to exercise a sound, reasonable, and legal discretion. . . . It does not imply intentional wrong or bad faith, or misconduct . . . but means the clearly erroneous conclusion and judgment — one that is clearly against logic and effect of such facts as are presented in support of the application . . . A judgment or decision by an administrative agency or judge which has no foundation in fact or in law . . . any unreasonable, unconscionable and arbitrary action taken without proper consideration of facts and law pertaining to the matter submitted."
Black's Law Dictionary defines "palpable" as "[e]asily perceptible, plain, obvious, readily visible, noticeable, patent, distinct, manifest." Proof of palpable abuse of discretion does not require evidence of motive.
 Palpable Abuse of Discretion
Plaintiff did not produce direct evidence regarding the motives behind the conduct of the State and its consultant. However, the Court does not require a "smoking gun"[5] to draw a reasonable inference that favoritism was present and that Defendant acted so unreasonably, arbitrarily and capriciously as to be guilty of a palpable abuse of discretion. The Court bases this inference on the evidence and on its determination of witness credibility.
The Court recognizes that it "was introduced to this controversy by an unsuccessful bidder whose counsel proceeded to cross-examine" State officials, its consultant and a representative of the winning bidder.[6]See Truk Away of Rhode Island, 643 A.2d at 816. As our Supreme Court stated in Truk Away of Rhode Island, "[T]he inherent nature of cross-examination is such that it is designed to bring out inconsistencies and to emphasize ambiguities." Id. However, the Court has considered voluminous exhibits, as well as deposition testimony, and have given this matter careful and thorough consideration. The Court is confident that it was able to distinguish between isolated instances of mistake elicited through skillful cross-examination and emphasized through articulate advocacy and material errors, which tainted the entire process.
The Department of Administration was ill prepared to undertake this complex procurement project. Key Department officials were either absent on medical or administrative leave, or were overworked and under educated in the statutory requirements of the competitive bidding process. Contrary to the mandate set forth in departmental regulations, Najarian did not require her staff to become familiar with the Regulations and certainly did not indoctrinate her personnel in their implementation. (See "Purpose of The Regulations," Exhibit JJ; Najarian Dep. at 14-17.)
The two individuals who managed the bidding process were cavalier about the importance of their task. Considering their total lack of prior experience with public procurement contracts, it defies logic that they would approach this significant project without reviewing the applicable statute and departmental regulations. Those Regulations require verbatim compliance with purchasing legislation. Since neither Johnston nor Kennedy read the statute, the Defendant hardly could be expected to conduct the process in compliance with the law.
The Court has reviewed the deposition testimony of Johnston and Kennedy carefully and finds that neither of them made a credible witness for the State. Kennedy gave evasive responses and was less than candid when attempting to explain the circumstances surrounding his various deviations from the letter and spirit of the Purchases Act. Johnston exhibited a convenient lack of memory and lack of knowledge of cross-over services. He displayed a selective understanding of the requirements of the RFP when he attempted to explain why United failed to quote Medicare rates for all three years of the contract. Whether due to ignorance of the law, their own flawed sense of fairness, or some other less innocent motive, they skewed the process in favor of United and denied BCBSRI fair and equitable treatment mandated by law.
The statute prohibits the State from modifying the RFP without notice to the offerors after the sealed bids have been opened. Nevertheless, the State effectively modified the RFP on three occasions:
Defendant modified the RFP when Kennedy eliminated the express requirement that bidders' fees for 2005 be submitted on an "immature" basis. He chose to consider 2005 fees on a "mature" basis because he believed that United had provided a "mature" quote, and he did not want to place the firm at a disadvantage.
Defendant modified the RFP again when Kennedy effectively eliminated the specification that bidders provide quotes for pharmacy rebates. The RFP did not require that those quotes be guaranteed. Based upon the amount received as rebates under the current contract and based upon Hewitt's own projections, an offer of 100% rebates, whether or not guaranteed, has significant value to the State. Kennedy's scoring of the rebate offer further displays treatment favoring United while placing BCBSRI at a disadvantage.
BCBSRI likely calculated its overall fees based upon its offer to provide 100% pharmacy rebates. By inviting a bid on this item, the State lulled BCBRI into believing that Defendant was interested in evaluating such a proposal. If the State believed that the offer had no value whatsoever without a guarantee, the RFP should have required a guarantee. When the State issued its "best and final" offer, it had an opportunity to revise the RFP. At that time, the State could have requested that the bidders offer a credit to administrative fees in lieu of pharmacy rebates.
Defendant modified the RFP again when it eliminated the express requirement that bidders quote fees for Medicare HMO for all three contract years. Because United submitted a non-responsive bid and provided fees only for the first contract year, Kennedy effectively re-wrote the RFP to require that bidders quote fees for only the first year. He disregarded BCBSRI's rates for 2006 and 2007 and scored the item based solely upon the quotes for 2005. Once more, Kennedy violated the statute to avoid placing United at a disadvantage while disregarding the rights of BCBSRI.
The statute prohibits the State from modifying the offeror's bids. Yet, the State effectively modified BCBSRI's bid when Kennedy took the higher "mature" fee that BCBSRI had quoted for comparison purposes and scored it in lieu of analyzing BCBSRI's bid based upon the fee the firm had actually quoted. This modification was willful and not the result of honest mistake. Kennedy made the change to ". . . be sure that in our financial comparison we compared apples to apples." (Kennedy Dep. at 85.) In other words, he wanted to avoid placing United at a disadvantage because he believed that United had submitted a non-responsive bid. In actuality, he unilaterally modified BCBSRI's bid to ensure fair treatment for United, at the expense of BCBSRI.
The statute prohibits the State from permitting an offeror to change its bid after a "best and final" offer has been submitted. Yet, the State invited United to modify its bid on two occasions. Neither modification reflects the correction of an honest and innocent mistake, as was the case in Gilbane Building Co., 109 R.I. at 236, 283 A.2d at 673. Both modifications were prompted by communications from or at the direction of Kennedy.
United modified its "best and final" offer to remove the extra fee it quoted for the "24 Hour Nurse Line." United had included the service without additional fee in its initial bid, but had clearly offered the nurses line at an additional charge in its "best and final" offer. As illustrated earlier in this decision, United's quote for the additional fee was clear and unambiguous. The State had instructed the bidders to submit only changes to their initial bid when filing their "best and final" offers, and United's submission was fewer than six pages long. (Exhibit O.) Kennedy had no reason to believe that United's fee change was the result of typographical error or confusion. Anderson's email to United, seeking a so-called clarification as to the differences between its initial bid and "best and final" offer, was nothing more than a suggestion to the offeror that United reconsider the additional fee and remove it. United accepted that less than subtle suggestion and modified its "best and final" offer after the bids were submitted. Again, Kennedy violated the statute to ensure that United's bid would be competitive, to the disadvantage of BCBSRI.
United modified its "best and final" offer again after Kennedy telephoned Patrick O'Brien to request that the company include cross-over services in its contract with the State at no additional charge. Kennedy erroneously had compared BCBSRI's bid that included the service with United's proposal that excluded cross-over services. United had offered the service at an additional charge. Defendant argues that this off-the-record conversation was not improper because it took place after United had received the tentative award. That argument fails because the communication was not initiated to obtain a better benefit plan for retirees. The Court finds that it was placed for the sole purpose of defeating BCBSRI's anticipated bid protest and sustaining the contract award to United. Kennedy's conduct, in this regard, rose to the level of bad faith.
In enacting the State Purchases Act, the legislature sought to ensure the fair and equitable treatment of all persons who deal with the procurement system of the State. Defendant's conduct frustrated this purpose again when the State penalized BCBSRI because it is regulated by DBR as it relates to its Medigap indemnity program. This penalty is significant for two reasons. First, it so clearly demonstrates the extent to which the State's conduct was arbitrary and capricious. No company doing business with the State should be penalized because it is subject to DBR regulations. Those regulations and that Department exist for the protection of the public. BCBSRI has no legal ability to guarantee the reserves portion of its administrative fee for its Medigap indemnity program.
Black's Law Dictionary defines an "arbitrary and capricious" decision or action as one taken "without consideration or in disregard of facts or law or without determining principle." Kennedy's decision to penalize BCBSRI for its inability to guarantee its fees under the Medigap indemnity program falls squarely within the aforementioned definition of arbitrary and capricious conduct.
Secondly, the actions of the State, as they pertain to this issue, magnify the extent to which it favored United during the competitive bidding process. Before deciding to penalize BCBSRI for failing to guarantee the fee, the State actually met to discuss whether or not to disqualify the BCBSRI bid proposal altogether as non-responsive. They ultimately rejected that option and decided to merely penalize BCBSRI in scoring its proposal. The State never met to discuss whether United's bid was non-responsive in spite of the fact that United's bid included only a "mature" fee for the first year of the contract and only quoted Medicare HMO fees for one year. Rather than reject United's bid as non-responsive or penalize United when scoring its proposal, Kennedy modified the RFP to accommodate the non-responsive aspects of United's bid.
Our Supreme Court decisions and the applicable statutory scheme adhere to the presumption that public officers will perform their duties properly. In this case, the overwhelming weight of the evidence rebuts that presumption. The public officers and the State's consultant displayed a manifest and palpable abuse of discretion in performing their duties in connection with awarding the State's contract for health plan administration to United.
 Declaratory Judgment Act
Plaintiff brings this action under the Uniform Declaratory Judgments Act, G.L. 1956 § 9-30-1, et seq. That act provides in pertinent part that the Superior Court:
 ". . . upon petition, following such procedure as the court by general or special rules may prescribe, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. . . . The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."
In appropriate cases, the trial justice may grant temporary injunctive relief for the sole purpose of preventing a declaration to which petitioner is entitled from becoming moot, and if supplemental relief becomes necessary, it is to be sought in a subsequent proceeding. G.L. 1956 § 9-30-8; Gray v. Leeman, 94 R.I. 451, 182 A.2d 119 (1962).
 Preliminary Injunction
When considering a request for preliminary injunction, the trial justice must consider: (1) whether the moving party has established a reasonable likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm without the requested injunctive relief; (3) whether the balance of the equities, including the public interest, weighed in favor of the moving party; and (4) whether the issuance of a preliminary injunction served to preserve the status quo ante." School Committee of North Kingstown v. Crouch, 808 A.2d 1074
(R.I. 2002); Iggy's Doughboys, Inc. et al. v. Gina Giroux, 729 A.2d 701
(R.I. 1999); The Fund for Community Progress v. United Way ofSoutheastern New England, 695 A.2d 517, 521 (R.I. 1997); Higham v.Affleck, 504 A.2d 1013, 1015 (R.I. 1986).
In this case, for the reasons set forth herein, the Court finds that Plaintiff has established a reasonable likelihood of success on the merits. The Court finds that BCBSRI will suffer irreparable harm without the requested injunctive relief. The public interest favors preserving the status quo at this time. If the State implements its contract with United, and the Court ultimately grants BCBSRI's request for Declaratory Judgment, the health coverage for over 52,000 state employees, retirees and their eligible dependents might be disrupted, resulting in potential hardship and injury. The issuance of a Preliminary Injunction will preserve the status quo and avoid such a disruption in the middle of the contract term.
When the Court grants a request to enjoin the award of a public contract on grounds of palpable abuse of discretion, the trial justice must also order the posting of security. Accordingly, this Court orders the Plaintiff to post security to pay for any costs and damages Defendant and United may incur or suffer in the event that it is later determined that Defendant has been wrongfully enjoined. See Truck Away of RhodeIsland, Inc., 643 A.2d at 811.
 Conclusion
After reviewing the entire record and considering the applicable law, this Court finds that the State's decision denying Plaintiff's bid protest is not supported by the reliable, probative and substantial evidence on the record, is affected by errors of law, and constitutes a palpable abuse of discretion. The State's decision to award the contract to United was further made in violation of statutory provisions and upon unlawful procedure.
The Court finds that the State and its consultant conducted the competitive bidding process in total disregard of the applicable statute and departmental regulations. They acted so unreasonably and arbitrarily and capriciously as to be guilty of a palpable abuse of discretion. The process was so infected with error favoring United that BCBSRI was denied fair consideration of its bid.
Plaintiff has proven a reasonable likelihood of success on the merits of the Declaratory Judgment action. The Court finds that Plaintiff will suffer irreparable harm without the requested injunctive relief, and that public interest weighs in favor of granting the request and preserving the status quo.
Accordingly, the Court grants Plaintiff's request for Preliminary injunction. Until further order of Court, Defendant, Beverly E. Najarian, Director of the Department of Administration and Chief of Purchasing for the State of Rhode Island, is hereby enjoined from completing and implementing the award of the State's contract for health plan administration to Intervenor, UnitedHealthcare of New England, Inc.
The Court finds that the competitive bidding process was so infected with error and tainted that those defects cannot be cured by merely reanalyzing and rescoring the existing proposals. The Court is inclined to order the trial of the action on the merits to be advanced and consolidated with the findings on Plaintiff's application for Preliminary Injunction. In such case, this Court would order a resolicitation, as provided under G.L. 1989 § 37-2-18, or in accordance with § 37-2-20
(2)(b), to be conducted consistent with this opinion.
This matter is continued to Friday, December 3, 2004 at 9:30 A.M. for further proceedings. Counsel shall submit the appropriate order for entry.
[1] See Amended Complaint, filed November 16, 2004.
[2] Cross-over services are a benefit incidental to a Medigap indemnity program saving the retiree the need to submit separate claim forms to Medicare and to the provider.
[3] Although Anderson's email states that the request is made pursuant to the Act, in fact, the statute only provides for competitive negotiations under certain circumstances. See G.L. 1989 § 37-2-20, which addresses negotiations after unsuccessful competitive sealed bidding. Defendant did not comply with the statutory requirements because the request was made before the chief purchasing officer determined in writing that there are no additional funds available from any source so as to permit an award to the lowest responsive and responsible bidder. Najarian did provide such a writing at a later date. However, she testified that she obtained only general information from the budget department ". . . in the context of the generality, vis-á-vis the budget and an understanding that we did not have an abundance of funds." (Najarian Depo. at 32). Kennedy testified that it was his understanding that requesting a "best and final" offer from the bidders was contemplated from the beginning of the process. (Kennedy Depo. at 66.)See also Regulations § 6.22. Additionally, the State did not revise its specifications when issuing the request for a "best and final" offer as contemplated under the Act.
[4] Tarnowsky voted against the award on grounds unrelated to the instant dispute, but the recommendation passed.
[5] On August 5, 1973, President Nixon released transcripts of taped conversations he had had six days after the Watergate break-in. Those transcripts became known as "The Smoking Gun" because they disclosed how early Nixon learned that his staff and re-election campaign had been involved in the break-in and also revealed his own participation in the cover-up. Following release of those tapes, it became clear that Nixon would be impeached and convicted in the Senate.
[6] The Court permitted Plaintiff to depose Patrick O'Brien, a representative of United, for the sole purpose of inquiring into off-record communications between the State and United.